**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Ronald EBENS, Defendant-Appellant.**

**No. 84–1757.**

United States Court of Appeals, Sixth Circuit.

Argued Dec. 12, 1985.

Decided Sept. 11, 1986.

1424

David M. Lawson, Frank D. Eaman (argued), Detroit, Mich., for defendant-appellant.

Maura D. Corrigan, Asst. U.S. Atty., Detroit, Mich., Wm. Bradford Reynolds, Walter W. Barnett, Dennis J. Dimsey, Civil Rights Div., Dept. of Justice, Washington,

D.C., Dennis J. Dimsey (argued), Bethesda, Md., for plaintiff-appellee.

Before ENGEL, KENNEDY and MILBURN, Circuit Judges.

ENGEL, Circuit Judge.

Ronald Ebens appeals from a judgment of conviction and a twenty-five year sentence following his conviction by a jury of count II of a two count indictment charging him and his stepson Michael Nitz under 18 U.S.C. § 245(b)(2)(F)[1] with violating the civil rights of Vincent Chin, a United States citizen of Chinese descent. Ebens had killed Chin in an altercation which occurred on June 19, 1982.

We cannot permit the judgment to stand because Ebens was denied a fair trial.

Ebens was originally prosecuted in the Wayne County, Michigan, Circuit Court and prior to trial pleaded guilty to the crime of manslaughter. When he was placed upon probation and fined $3,720, public outrage at the perceived lenity of the penalty was extensive, especially within the Chinese-American community. The case was accompanied by massive publicity at both the state and national levels and undoubtedly because of activity on behalf of the Chinese-American community, the United States Department of Justice, overruling the decision of the local United States Attorney not to prosecute, instituted proceedings under the Civil Rights Act in the United States District Court for the Eastern District of Michigan.

We address the issues in the order in which they have been raised by appellant and the facts are further developed as pertinent to each issue.

## I.

Ebens claims that the trial court erred in failing to grant his motion for change of venue.

Ebens had originally moved the district court for an eight to twelve month continuance of the trial in order to permit the effect of the extensive publicity surrounding the case to dissipate. Before that motion was decided, Ebens on February 17, 1984, filed a motion for change of venue.

The joint appendix filed in the appellate record contains sixty-eight pages of articles from Detroit newspapers about the Chin matter. Three video tape recordings of television broadcasts were also made a part of the record. As the trial judge noted, the publicity was not only extensive but was all adverse. A Detroit attorney, Lisa Chan, formed a group known as The American Citizens for Justice, and appears to have been instrumental in publicizing the killing, the handling of the case by the Wayne County Prosecutor's office and the sentences given to Ebens and Nitz in the state court. Rallies were held and the pub-

1. This section provides:
 (b) Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

 \* \* \* \* \* \*

 (2) any person because of his race, color, religion or national origin and because he is or has been—

 \* \* \* \* \* \*

 (F) enjoying the goods, services, facilities, privileges, advantages, or accommodations of any inn, hotel, motel, or other establishment which provides lodging to transient guests, or of any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility which serves the public and which is principally engaged in selling food or beverages for consumption on the premises, or of any gasoline station, or of any motion picture house, theater, concert hall, sports arena, stadium, or any other place of exhibition or entertainment which serves the public, or of any other establishment which serves the public and (i) which is located within the premises of any of the aforesaid establishments or within the premises of which is physically located any of the aforesaid establishments, and (ii) which holds itself out as serving patrons of such establishments;

 \* \* \* \* \* \*

 shall be fined not more than $1,000, or imprisoned not more than one year, or both; and if bodily injury results shall be fined not more than $10,000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life.
 18 U.S.C. § 245(b)(2)(F).

licity generated much television coverage including at least two special news stories on the subject and a program over national television as well. The public excoriation of the state trial judge who placed Ebens and Nitz on probation was particularly severe. The headlines can only be described as scathing. One large cartoon, appearing in *The Detroit News*, even showed the trial judge putting a baseball bat in one ear, as if it were a pencil, and sharpening it with a pencil sharpener installed in the opposite ear.

We have carefully reviewed the extensive record made of the publicity in the case and agree that it was indeed pervasive. The question of venue is made particularly difficult because of the framework in which the prosecution arose. The nearly unanimous public judgment that Ebens and his stepson should have received jail terms and the harsh criticism of the state trial judge, followed by the federal prosecution of defendants based upon the same incident, was bound to lead to a strong public impression that justice had not been done in the state court and that it was incumbent upon the federal government to right that wrong by a second prosecution. Nevertheless we are unable to hold that the trial judge committed error when she determined to proceed to impanel a jury. While it probably would have been advisable for the trial judge to have ordered a change of venue, we conclude that it was not reversible error for her to proceed to impanel the jury. A change of venue would undoubtedly have occasioned great inconvenience both to the defense and to the government. Further, the publicity was so extensive that it was not altogether certain that any location to which the trial might be removed would itself be free from the potential impact of the publicity which had already occurred and that which was bound to accompany the trial, wherever it was held.

We are further persuaded in our holding by our observation that the process for selecting the jury was carried out with exceptional care and sensitivity. Prior to voir dire, each potential juror was required to complete a seven page questionnaire containing forty-two questions. In addition to the usual inquiries bearing upon a juror's potential bias generally, the jurors were specifically asked to set down what they knew about the Chin case and what the source of that knowledge was. Of the one hundred fifty-nine potential jurors who were ultimately examined on voir dire by the court and counsel, seventy-eight were excused for cause, the vast majority of them by the court on its own motion. Ebens' counsel moved to exclude only four jurors for cause. Of the seventy-eight excused for cause, thirty-four were excused because they acknowledged that they were unable to disregard the publicity. Thirteen of the one hundred fifty-nine potential jurors stated that they had not been exposed to any publicity. All of those ultimately seated were carefully questioned concerning their ability to hear the evidence in the case free of any prior knowledge of the case through the media. Of the thirteen ultimately seated, three had no prior knowledge and ten possessed some knowledge but satisfied the court that they would be able to hear the case free of any bias as a result of that knowledge. Each defendant was allotted twenty peremptory challenges. Counsel for Ebens exercised seven peremptory challenges (although the trial judge understood that the defense had exercised only five).

■ Both government and defense rely upon *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), to support their positions concerning the necessity for a change of venue. The trial court specifically found that the jurors chosen were free of bias. It is well settled that a juror's previous knowledge of the facts of the crime through the media is not itself dispositive of the issue of that juror's qualification to sit. The jury selection process was fair and in accord with the concerns expressed by the majority of our court in *United States v. Blanton*, 719 F.2d 815, 830 (6th Cir.1983) (en banc), *cert. denied*, 465 U.S. 1099, 104 S.Ct. 1592, 80 L.Ed.2d 125 (1984), as well as those expressed by

this writer in his dissent and cases cited therein. While we do not hold that the failure to exercise all of the allowed peremptory challenges, or failure to challenge for cause all of the jurors who were seated, is invariably fatal to a motion for a change of venue, certainly this factor is of great importance in determining whether the jury so selected was capable of meeting the demands of impartiality placed upon it by law.

## II.

Ebens next claims that he was entitled to a directed verdict of acquittal. We disagree.

In review of such issues, the court is of course obliged to consider the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Adamo*, 742 F.2d 927 (6th Cir.1984), *cert. denied sub nom. Freeman v. United States*, 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985). Only if no rational jury could have convicted is it error not to grant the motion. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *reh'g denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979). Ebens' motion in this regard must be considered in the light of the elements of the crime with which he was charged. His arguments go not to the factual events of the altercation itself and of his wielding the baseball bat which caused Chin's death, but to the specific intent which is inherently a part of the statute.

Ebens was acquitted of count I of the indictment charging him with conspiracy to deprive Chin of his civil rights under 18 U.S.C. § 241. He was convicted of count II charging him with interfering with Chin's civil rights by wilfully injuring, intimidating and interfering with Chin on account of his race or national origin and because the latter was and had been enjoying the privileges and accommodations of the Fancy Pants Lounge, a place of entertainment open to the public, by threatening, beating, and assaulting Chin with the result that the latter died, all in violation of 18 U.S.C. § 245(b)(2)(F).

The incident giving rise to this litigation occurred on June 19, 1982, in Highland Park, a suburb of Detroit. Chin, then twenty-seven years old, lived with his mother in Oak Park, Michigan, another suburb of Detroit. He had come to this country from China in 1961 when he was adopted by a Chinese-American couple. He became a United States citizen in 1965.

To celebrate his upcoming wedding, Chin invited his friends Robert Sirosky and Gary Koivu to meet him at a topless bar at 7:00 p.m. that night. After about an hour there and after having several drinks the group went on to the Fancy Pants Lounge, a nude dancing establishment in Highland Park. En route they purchased a pint of vodka and it is rather apparent from the record that they were in a mood of elevated joviality in consequence. Koivu later left to pick up one Jimmy Choi, another of Chin's friends, and together they brought another bottle of vodka into the Fancy Pants. The group was laughing, tipping the dancers heavily, and generally celebrating. At that time Ronald Ebens and his stepson, Michael Nitz, were also at the Fancy Pants, sitting directly across the elevated dancing runway from Chin and his friends. Construing the evidence most favorably to the government, Ebens began making racial and obscene remarks toward Chin calling him a "Chink" and a "Nip" and making remarks about foreign car imports. It is apparent that Ebens seemed to believe that Chin was Japanese and he was quoted as having made the further comment that "it's because of you little mother fuckers that we're out of work." Ebens may not have distinguished between Orientals of Japanese and Chinese descent since there is testimony to show he made references to both. After a further exchange of words Chin got out of his chair and walked up to the stage where Ebens was sitting and there was general jostling and fighting between Ebens and Chin in which Nitz then joined. The doorman and the parking lot attendant broke up the fight. The parking

lot attendant took Chin outside and the doorman took Ebens and Nitz to the men's room. The doorman got a towel and some ice for Nitz who was bleeding from a cut on the head and later escorted Ebens and Nitz outside. The quarrel resumed outside the Fancy Pants Lounge. Chin challenged Ebens to finish the fight outside, calling him names. Ebens thereupon went to Nitz's car, opened the hatchback and removed a baseball bat. Seeing Ebens with a bat, Chin fled across Woodward Avenue and was pursued a short distance by both Ebens and Nitz.

While still in the Fancy Pants parking lot, Chin's three friends had decided that Choi would join Chin across Woodward Avenue and that Koivu and Sirosky would get their car and pick him up. Ebens and Nitz drove by in their car and, seeing Sirosky and Koivu, stopped and asked where their friend was. When they said they didn't know, Ebens then saw Choi and started after him. Nitz threw a glass bottle at Choi, and Ebens and Nitz returned to their car and drove off after Choi. After driving about a block from the Fancy Pants, Sirosky and Koivu stopped the car, removed a tire iron from the trunk and headed back toward the Fancy Pants. Unexpectedly they came upon Nitz's car which was parked on Woodward Avenue. Ebens got out of the car with the baseball bat and chased Sirosky and Koivu a short distance before getting back into Nitz's car. Meanwhile, after Choi had crossed Woodward Avenue he found Chin and suggested that they should flee. The two then ran south on Woodward Avenue for a few blocks until they stopped at a McDonald's restaurant where they apparently sought protection in the crowd, also hoping that Koivu and Sirosky would find them. Choi picked up a piece of wood for protection and handed Chin an unbroken bottle. Ebens and Nitz continued to look for Chin and upon meeting one Jimmy Perry, Nitz offered Perry $20 to help him find and catch a "Chinese guy."

According to Perry's testimony Ebens and Nitz talked during the ride about catching a "Chinese guy" and "busting his head" when they caught him.

The final confrontation occurred in the lot of a supermarket next to McDonald's. Ebens and Nitz approached Chin and Choi using a parked truck for cover. Ebens was still carrying the baseball bat. Chin saw them coming and yelled "Scram." Choi escaped but Nitz grabbed Chin in a bear hug from behind. Chin broke loose and ran onto Woodward Avenue. Ebens struck Chin several times with the bat on the back and head causing Chin to fall to the ground. While the precise circumstances of the assault are in dispute, especially whether Nitz was holding Chin at the time, it is undisputed that Ebens was the aggressor. Meanwhile, the Highland Park police officers who were working as security guards at McDonald's came up, drew their guns and ordered Ebens to drop his bat.

Chin was taken to Henry Ford Hospital, losing consciousness several times en route. He suffered two lacerations on the back left side of his head and abrasions on his shoulder, chest and neck and lapsed into a severe coma. After the performance of emergency surgery his brain ceased functioning entirely. At 9:50 p.m. June 23, 1982, a ventilator which had been employed to keep him breathing was removed and he was pronounced dead.

In claiming that there was insufficient evidence to convict him of a violation of section 245, Ebens essentially admits the physical facts of the assault. He nonetheless claims that what transpired was simply a barroom brawl which got out of hand and resulted in the death of one of the participants and injuries to another. He claims that there is an absence of any evidence by which the jury could find beyond a reasonable doubt (1) that he was motivated because of the race, color and national origin of Vincent Chin and (2) that his purpose was to injure, intimidate, and interfere with Vincent Chin's right to enjoy a place of public accommodation. He disclaimed the racial nature of the remarks attributed to him and asserted that the fight arose over Chin's insulting treatment

of one of the dancers. He also claimed that the actual physical contact was initiated by Chin both in the Lounge and outside when Chin waited outside for Ebens to emerge and then challenged him to a fight.

██ We do not agree with Ebens' initial contention that, in enacting section 245, Congress intended to limit its application exclusively to vindicate the rights of blacks and of white civil rights workers who aid blacks but not to alleged discrimination against citizens of Oriental descent by whites. Section 245(b)(2) protects any person "because of his race, color, religion or national origin" from intimidation or interference in the enjoyment of the facilities or accommodations of any "place of exhibition or entertainment which serves the public...." Orientals come within the broad constitutional protections of the Fourteenth Amendment even though the original thrust of the amendments was primarily motivated by concern for the rights of black persons. *See Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

Ebens relies upon *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) and *United States v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), as requiring proof of a specific intent to deprive a person of a federal right made definite by decisions or other rule of law. In interpreting the predecessor to 18 U.S.C. § 242, the Supreme Court stated,

> [T]he specific intent required by the Act is an intent to deprive a person of a right which has been made specific either by express terms of the Constitution or laws of the United States or by decisions interpreting them.... Of course, willful conduct cannot make definite that which is undefined. But willful violators of constitutional requirements, which have been defined, certainly are in no position to say that they had no adequate advance notice that they would be visited with punishment."

*Screws*, 325 U.S. at 104–05, 65 S.Ct. at 1036–37. Any deficiencies in the charge brought under section 241 need not concern

us for Ebens was in all events acquitted of that charge. He was convicted of section 245. As evidenced by its plain statutory language of section 245, the federal right itself is specifically spelled out: it includes the right to be free from intimidation or interference in the enjoyment of public facilities such as the Fancy Pants Lounge. The statute does not suffer from lack of specificity.

██ A jury could have concluded beyond a reasonable doubt that Ebens, in initiating the ultimate conduct by uncomplimentary remarks toward Chin, was motivated by his belief that Chin was Japanese, not Chinese. The jury could have believed that this color and race-based or national origin bias against Chin induced Ebens to make the comments he did and that he was further irritated when he saw Chin enjoying himself in the lounge and spending money freely. The jury could further have found that his remarks were intended to make Chin's remaining on the premises uncomfortable and embarrassing and to intimidate and dissuade him from remaining on the premises because of that bias.

It is true that the ultimate assault which caused Chin's demise may also have been motivated by Chin's injury of Ebens' stepson, but defense counsel acknowledges that a specific intent to violate federal law need not have been the first among several evil intents. *See, e.g., Anderson v. United States*, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974) (dealing with section 241); *United States v. Bledsoe*, 728 F.2d 1094 (8th Cir.), *cert. denied*, 469 U.S. 838, 105 S.Ct. 136, 83 L.Ed.2d 76 (1984) (a substantial motivating factor).

██ We find no merit in the claim that the prosecution must fail because of an absence of direct evidence that the beating in front of McDonald's restaurant related to Chin's race or the fact that he had been in a place of public accommodation earlier. A rational jury could have found that the events at McDonald's were the culmination of a single and basically inseparable incident. It was altogether proper for the jury to consider this evidence and the comments

made by Ebens as bearing upon his specific intent.

### III.

Ebens claims that the trial court committed reversible error in refusing to permit the admission of certain evidence which was offered by Ebens to impeach the government's witnesses. Specifically, two types of evidence are involved.

As we have stated, after the state court sentencing, Lisa Chan, a Detroit attorney, formed a group known as the American Citizens for Justice and appears to have been instrumental in publicizing the killing and the handling of the case by the Wayne County prosecutor's office. Ms. Chan traveled to Washington, D.C., to discuss the matter with William Bradford Reynolds, Assistant Attorney General in charge of the Civil Rights Division of the Department of Justice with respect to the possibility of federal prosecution. Rallies were held in Detroit, in which the protestors carried placards reading "Jail the racist killers" and "It's not fair," the latter a comment made by Chin before he lapsed into unconsciousness. It is undisputed that the events occurring after the state court sentencing received widespread publicity.

The three principal government witnesses were Choi, Sirosky, and Koivu. All testified, in one form or another, concerning the incident and the statements purportedly made by Ebens in the course of the evening from which racism could be found.

Ebens and codefendant Nitz sought to introduce into evidence tape recordings of interviews which had been conducted by Lisa Chan with these witnesses. The defense purpose was to demonstrate that the witnesses' testimony concerning Ebens' racist statements was false and that it was the result of improper coaching of them by Chan in preparation for the trial. He claimed that the tapes were admissible to show collusion, witness influence, and prior inconsistent statements. Each time the defendants sought to introduce the tapes, however, the court sustained the government objection on hearsay grounds, ruling

however that the defense counsel could confront a witness who takes the stand with his own words on the tape but that the statements of Lisa Chan to the witness which elicited that witness' statement could only be introduced through her should she be called. The government concedes that these rulings were erroneous.

The government correctly notes in its brief on appeal that the definition of hearsay under the federal rules requires that the third party statement testified to by the witness in question be offered for the purpose of proving the truth of the matter asserted. Fed.R.Evid. 801(c); *United States v. Gibson*, 675 F.2d 825 (6th Cir.), *cert. denied*, 459 U.S. 972, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982). Obviously the purpose of introducing the Chan tapes was to show the effect of Chan's statements on the testimony of Choi, Sirosky, and Koivu. Plainly, Chan's out of court utterances were admissible to show not the truth of what she said but the effect on Choi, Sirosky and Koivu as bearing on whether the witnesses' subsequent sworn testimony was coached and hence inaccurate. *See* 4 Weinstein's Evidence ¶ 801(c)[01], at 801–77 to –80 (1985). In this light, the tapes were highly relevant and important to the defense.

The defense did use the transcripts of the tapes to some extent during the trial. Counsel for Ebens examined Koivu concerning the purpose of his meeting with Chan. Koivu replied, "Well, she wanted to get an idea of what happened, just to get the flavor of the night, to get an idea of what happened." The defense also questioned Koivu about specific responses he had made to Chan's questions. In the interview, Koivu expressed fear that his testimony, as well as that of Choi and Sirosky, would sound too rehearsed. On cross-examination, defense counsel asked Koivu whether he had expressed this fear to which he replied, "In a way."

In cross-examining Robert Sirosky, the defense again attempted to prove two prior inconsistent statements by reciting questions asked by Ms. Chan and the responses given by Sirosky. However, the most ex-

tensive use of the Chan tapes was during the testimony of Jimmy Choi. Defense counsel sought to discredit Choi's testimony that he heard racial slurs by introducing a portion of the Chan tapes. In this portion Choi suggested to Lisa Chan that he did not hear any racial slurs made by Ebens on the night of the fight. When he denied making any such statement, defense counsel read Chan's questions and Choi's responses. Later in Choi's cross-examination, the defense used the transcript of the tapes to refresh Choi's recollection.

The government relies upon our decision in *United States v. Touchstone*, 726 F.2d 1116 (6th Cir.1984). In that case a panel of our court held that cross-examination of a witness may properly be restricted under the rules limiting the use of other acts evidence in impeachment of witnesses where, notwithstanding the limitation, there is otherwise sufficient evidence presented to the jury to enable it to make a "discriminating appraisal" of the credibility of such witnesses.

■ The erroneous exclusion of testimony on grounds of hearsay is reversible error if the reviewing court finds that such error affects the substantial rights of the defendant. Fed.R.Crim.P. 52(a). *United States v. Parry*, 649 F.2d 292 (5th Cir. 1981); *United States v. Barrett*, 539 F.2d 244 (1st Cir.1976). In these cases, the convictions were reversed and the cases remanded for new trials upon a finding that the erroneous hearsay rulings resulted in the exclusion of testimony favorable to the defendants. Both cases relied upon *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), for the proposition that the erroneous hearsay rul-

ing constitutes reversible error where it affects substantial rights. *Kotteakos* held that in considering whether the ruling has such an effect, "[n]ecessarily the character of the proceedings, what is at stake upon its outcome, and the relation of the error asserted to casting the balance for decision on the case as a whole, are material factors in judgment." *Id.* at 762, 66 S.Ct. at 1246.

We unanimously conclude that a consideration of these cited factors mandates reversal.

■ Ebens should have been permitted to introduce into evidence the entire contents of the tapes at least insofar as they involved conversations occurring at the time the government witnesses were present. The three witnesses were the most crucial of all witnesses for the government. Each testified as to events inside the Fancy Pants Lounge and to verbal exchanges between Ebens and Chin. The Chan tapes were offered to support Ebens' claim that Choi, Koivu and Sirosky did not tell the truth when they testified that they heard the racial statements. Since the physical facts of the assault were essentially undisputed, the entire defense hung upon Ebens' claim that the fight was not racially motivated. It is true that the district court permitted the defense to elicit the statements made in interviews and did allow a few of the statements, but it was not within the province of the court's proper discretion to prevent the jury from hearing the tapes themselves and judging for themselves the impact upon the witnesses which the purported conversation had and measuring that against the statements made in court by the witnesses.[2] The de-

2. The full transcript of the tape was made a part of the record for preservation purposes and the comments of Lisa Chan in the presence of the witnesses are indeed strongly indicative of an endeavor to influence and rehearse their testimony. Illustrative of these statements is the following:

"Liza [sic] Chan: The purpose of this meeting tonight is so we can help each other remember exactly what happened, how it happened, when it happened and all the minor details. We were just going over—I was talking with Eddie Hollis this afternoon, the parking lot

attendant, the black guy, I don't know when he came in. I think—but according to his version of the facts, it's quite different from what I have so far understood them to be. So, I would center on my facts on what you, three of you, say they are and somehow try to either fit all the other facts around these, or if they don't fit, then I have to watch out, you know, there's something else, somebody saying something else."

We have appended to this opinion other statements made by Chan and others in these inter-

fense has called our attention to a First Circuit opinion, authored by Chief Judge Campbell, which states the case well:

> "We know of no case holding or even suggesting, and the government has cited none, that counsel must introduce testimony in a manner so as to avoid evidentiary problems. It is the essence of our adversary system that counsel, not the court, chooses how evidence is to be presented. Trial tactics and strategy are the responsibility of counsel. Counsel offers the testimony; the court determines its admissibility based on the rules of evidence, not whether an alternative method of introducing it would be preferable. Particularly in a criminal case, a defendant cannot be penalized by the exclusion of otherwise admissible testimony because his counsel has chosen to proceed in a manner which requires a difficult ruling by the court. * * * We also note that, given a choice, defense counsel in a criminal case might well want to avoid calling [hostile witnesses] even though rebuttal testimony is available."

*United States v. Ouimette,* 753 F.2d 188, 192 (1st Cir.1985).

### IV.

Ebens next asserts that the trial court erred in permitting the testimony of government witness Willie Davis concerning events which allegedly occurred and were observed by him in 1974 in a Detroit bar by the name of Jo-Jo's. It was the government's theory that a tall blond man named Ron harassed Willie Davis, a black, inside the bar and that the tall blond man was Ronald Ebens. Davis testified that he went into Jo-Jo's Bar to talk with the owner and that three white men entered after him. One of the three addressed another as Ron. Davis then testified that "Ron said something about niggers." Although Davis said that he did not pay much attention to the statement, the owner's wife suggested that Davis leave. When Davis asked

whether she was speaking to him, Ron said, "yes, nigger, she's talking to you." Davis further testified that the men made other racial remarks. It was the government's theory that the Ron in Jo-Jo's Bar was the defendant Ronald Ebens and it introduced the testimony for the purpose of showing that Ebens generally was possessed of a bigoted mind and that he therefore possessed the requisite intent under 18 U.S.C. § 245 when he assaulted Chin.

■ We are convinced that it was reversible error for the trial court to have admitted this testimony, for several reasons. Courts may admit evidence of prior bad acts if the proof shows by a preponderance of the evidence that the defendant did in fact commit the act. *United States v. Leonard,* 524 F.2d 1076, 1090–91 (2d Cir. 1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976).

Ebens challenges the Davis testimony on two bases. First he asserts that the prior event was too remote in time to be relevant to this case. Second, he claims that Davis' identification of Ebens was too indefinite to be probative. We agree particularly with the second argument and conclude it was error to have permitted such testimony and also, once elicited, to have refused to strike it.

The government, in defense of the propriety of its calling Willie Davis, relies upon the admissibility of his testimony under Fed.R.Evid. 404(b) to show that Ebens had committed prior similar acts. Rule 404(b) provides:

> **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

---

views. The content of these nonhearsay statements shows why their erroneous exclusion by

the trial court was not harmless.

Fed.R.Evid. 404(b). Case law in our circuit has been quite supportive of the broad discretion accorded the trial judge in determining whether such other acts evidence is admissible against a defendant in a criminal case. *See United States v. Dabish,* 708 F.2d 240, 243 (6th Cir.1983); *United States v. Vincent,* 681 F.2d 462, 465 (6th Cir.1982) and cases cited therein. While our court in *Vincent* had no occasion on the facts before it to choose between a "clear and convincing" standard for admission of such evidence of prior acts or whether to adopt what it characterized as a minority view that it was admissible if "sufficient to support a finding" that the act was committed, *see also Dabish,* 708 F.2d at 243 n. 2, the court there found that in any event the prior acts had been established "beyond doubt." Here, it was an abuse of discretion under either test to have admitted the testimony. The proof that Ebens was the same man as the Ron in the bar some eight years earlier was entirely too unreliable to justify its use against him in any event.

The following language from *Vincent,* also cited with approval in *Dabish,* illuminates what we consider to be the proper approach to an evaluation of testimony whose admission is sought under Rule 404(b):

> In reviewing the admission of evidence challenged under Rule 404(b), we must make two determinations. First, we must decide whether Vincent's post-arrest conduct was admissible for any *proper* purpose, as distinct from the *improper* purpose of showing "character" or "propensity." *United States v. Cooper,* 577 F.2d 1079, 1088 (6th Cir.), *cert. denied,* 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978). If we conclude that there was a proper basis for admission, we must then consider whether the probative value of the evidence outweighed its potential prejudicial effects. *See* advisory committee note to Subdivision (b); *United States v. Ring,* 513 F.2d 1001 (6th Cir.1975). In the second instance, the standard of review on appeal is

whether the trial judge abused his discretion in admitting the evidence. *United States v. Czarnicki* [sic], 552 F.2d 698 (6th Cir.), *cert. denied,* 431 U.S. 939, 97 S.Ct. 2652, 53 L.Ed.2d 257 (1977).

*Vincent,* 681 F.2d at 465.

The "other acts" which the government would have attributed to defendant Ebens were statements containing racial slurs cast at the witness Davis on account of his race and reference to him as a "nigger." The government sought to persuade the jury that the party who made that statement was Ebens and that the reference to "nigger" evidenced a specific prejudice against minorities generally. Had the statement been made in the recent past and against someone of Oriental extraction, a strong case might have been made for the admission of such testimony under 404(b). A jury could then rationally have concluded that the racially insulting words were intended to persuade a patron to leave the bar. Further, the testimony at least by Davis, was that he was asked to leave, presumably to avoid the risk of further confrontation.[3] The difficulty is that the comments about which Davis testified were directed to someone of a different race and were substantially remote in time, having happened in 1973 or 1974 whereas the incident in question occurred in 1982.

More serious, however, is the failure to establish by any standard that Ebens had in fact been present at Jo-Jo's Bar at the time of the statements and if so had been the person who had made them. The government agents and government counsel obviously believed they were one and the same and that Davis' reluctance to testify on behalf of the government and against Ebens was induced by fear and intimidation. The difficulty is that there was no testimony to support this belief. Inferences to the contrary although implicit in the unsworn questions were not corroborated by sworn answers.

It was apparent that the government attorney had had a prior conversation with

---

**3.** The co-owner of the bar denied any recollec- tion of the incident.

Davis and the form of the prosecutor's questions suggested that an extra-judicial statement had been made by Davis at the time which was inconsistent with his statement at trial. That statement, however, was never introduced in evidence and we do not know what it was or whether it was shown to Davis. Davis admitted having talked to government agents but testified that he had refused to make statements and had insisted that he would talk only upon being subpoenaed. He admitted that he had been approached by defense counsel but likewise denied that he had been intimidated or threatened by them, contrary to the implications in the questions put to him by the government. He did claim that a person named Ron who was tall and blond had been among three men who had come into Jo-Jo's Bar on the night in question when certain demeaning statements had been made to him concerning his race. He steadfastly refused, however, to identify defendant Ebens as that same person.

It developed that Ronald Ebens had himself owned a bar known as Ron's Bar not too far from Davis' home and that he had opened it after the incident in Jo-Jo's Bar. The proof showed also that Davis had had occasion to go into Ron's Bar at least twice. He therefore readily admitted that he identified and knew Ronald Ebens but insisted that he was unable to identify the person named Ron who had several years previously come into Jo-Jo's Bar.

The end result was that the government failed to establish by either the weight of the evidence or by clear and convincing evidence that the "other acts" sought to be introduced were in fact those of defendant Ebens. Under the circumstances therefore we conclude that the application of the cited rule from *Vincent* should have led the trial court to a determination that the probative value of the evidence, if it possessed any at all, was in all events outweighed by its potential prejudicial effect. *See United States v. McFadyen-Snider*, 552 F.2d 1178, 1184 (6th Cir.1977); *United States v. Czarnecki*, 552 F.2d 698, 702 (6th Cir.), *cert. denied*, 431 U.S. 939, 97 S.Ct. 2652, 53 L.Ed.2d 257 (1977). *See also*

*United States v. Ismail*, 756 F.2d 1253, 1259 (6th Cir.1985), which requires that such evidence must be substantially similar and near in time to the offense charged in the indictment. We believe that this testimony is too remote in time, too uncertain in its authenticity, and in its application here was highly prejudicial to the rights of defendant Ebens.

While the better course would in any event have been to make a special record before determining the admissibility of the evidence, thus keeping it from the jury altogether, *cf. United States v. Robinson*, 700 F.2d 205 (5th Cir.1983), *cert. denied*, 465 U.S. 1008, 104 S.Ct. 1003, 79 L.Ed.2d 235 (1984), certainly when the tenuous nature of Davis' testimony was not followed up by any corroboration, it should have been stricken and the jury instructed to disregard it. It does not take much imagination to understand how such grossly biased comments would be viewed by the jury. We need not know the racial composition of the jury, for nearly all citizens find themselves repelled by such blatantly racist remarks and resentful of the person claimed to have uttered them. Davis' testimony could only have inflamed the jury rather than have enlightened it concerning any real predisposition or specific intent on the part of the defendant himself. Further as we shall note later the error was compounded when the prosecutor sought unsuccessfully to attribute to Ebens a comment which he claimed was made to Willie Davis in 1974 by the person in Jo-Jo's Bar, a comment to the effect that defendant had called Davis a "black son of a bitch." In Davis' direct examination, counsel sought to elicit that Ebens had made this demeaning statement:

Q. Now, Mr. Davis, didn't this man, Ron, say other things to you?

A. They was talking about niggers looking for white women and so on and so forth, like that. It didn't bother me because I wasn't looking for that sort of thing. I wasn't interested in that.

Q. Didn't he say, what is this black son of a bitch doing in the bar?

A. They made a lot of remarks. I can't recall all the remarks. They was making remarks when I went out the door.

Q. Didn't you tell Agent Garrety that he said that specific statement?

A. I don't know as I told you all that. I don't know what all the remarks they did make, but I do know about the nigger and the white—

Q. Didn't you tell me, Mr. Davis, that specific statement?

A. No, sir, I didn't. I didn't have too much to say to you because the reason I didn't was when you all came [to] my door I didn't know who you was. One of my neighbors was in front of you and when the doorbell rang I went to the door. I don't know whether it was you or the other gentleman, says he was first. My neighbor asked me for a broom.

Proper examination of a hostile witness (assuming Davis was hostile) based upon a prior inconsistent statement, is to produce the statement for the witness' examination for the purposes of refreshing his memory. Use of cross-examination had the improper effect of implying to the jury not only that the witness made the statement in question but that the government had proof to that effect. This is particularly dangerous when the material so implied is inflammatory. Even had the statement been introduced to impeach the credibility of Davis, it would not in any event have been admissible as substantive proof that Ebens uttered the statement. *United States v. Lester*, 491 F.2d 680 (6th Cir.1974); Fed.R.Evid. 801(d)(1). While the trial court here gave a precautionary instruction to the jury it was only to the effect that "the testimony of Mr. Davis insofar as it attributes certain statements to Mr. Ebens and certain conduct to Mr. Ebens is received here only as evidence directed at Mr. Ebens and may not be against co-defendant Nitz." The precaution did not limit the purported out-of-court statement to impeachment only but instead concentrated its inflammatory effect upon Ebens. The prejudice is further compounded by the closing argument of government attorney Theodore Merritt:

You remember, he was subjected to at least one other episode that that racial animal unleashed. Remember the testimony of Willie Davis? Well Mr. Davis testified that he knew Ronald Ebens, that he owned a bar right behind his house in 1976. But Mr. Davis said he went into that bar two times even though it was right behind his house. Well I think you know the reason why. In 1974, he told you that a man named Ron, who looked like Ronald Ebens, came into a different bar where Willie Davis was having a drink and started calling him a nigger and a black son of a bitch, and accusing him of chasing white women. And Willie Davis told you that he didn't want to cause any trouble so he left the bar. But Ron and his friend followed him to the door, and only when Willie Davis grabbed a tool from his truck, did they go back inside. Does that sound like a familiar scenario? You heard Willie Davis testify that the FBI interviewed him three times, once in my firm, and that we wanted him to be a witness for the government. And you also heard him testify that after he was visited by the defense investigators that weekend before he was going to testify, that they waived [sic] his police record in front of him and they said that they had spoken to Ronald's friends, they knew nothing about this. Well, Willie Davis was a lot more reluctant to positively ID Ronald Ebens. But you know why Willie Davis lost his memory about that.

Finally, to compound the prejudice to Ebens further, the trial court rejected an offer of proof by defense counsel that during the two years when Ebens had operated a bar of his own, he had served both blacks and whites and had neither harassed, intimidated nor otherwise bothered minority persons who used his place of accommodation.

Normally this might be considered as having at best a peripheral relevance to rebut the inference made by government

attorneys from the fact that Davis, because of Ebens' hostility to blacks, had entered Ron's Bar only twice during the years he owned it although it was located very close to Davis' home. Moreover, the government is correct that Ebens himself was permitted to testify in his own behalf that while he owned his own bar, Ron's Place, he served people of all races. He also called Hattie Sepak, the owner of Jo-Jo's, who testified that she could not recall any racial incidents occurring there. His effort to call two other witnesses, regular customers at Ron's Place, to testify as to the absence of refusal of service and racial incidents while Ebens owned the bar, was rejected by the trial judge on the basis that evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant. *See United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir.1978). While the trial court indicated that it would have permitted him to present evidence of prior acts as character evidence, the defendant maintained he did not intend to employ Fed.R.Evid. 405(a) which thereby put his general character in issue, but instead believed that he was entitled to corroborate his own testimony in view of the most damaging inferences made through the questioning of Davis. The government claims that Ebens has not shown any case law as authority that dissimilar acts are admissible on behalf of the defense under Fed.R.Evid. 404(b) to rebut like testimony of similar acts.

While we would normally not fault the trial judge's exercise of discretion in excluding such testimony, permitting a similar latitude in the defense that was granted the prosecution might at least have helped to dissipate the highly prejudicial impact upon the jury of the inadmissible evidence and to preserve the general fairness of the trial.

Ebens also asserts that he was prejudiced by the trial court's improper exclusion as hearsay of the proofs he offered of prior inconsistent statements of government witnesses Jimmy Perry and police officer Michael Gardenhire. It was Perry's testimony at trial that he had been picked up by Ebens and Nitz after they left the Fancy Pants and had been brought along to help locate Chin and Choi. Perry further testified that one of them had offered him $20 to help them find and catch "a Chinese guy." In cross-examination Ebens' counsel tried to discredit Perry's statement concerning the offer of $20 by showing that Perry himself was suspect and that his testimony concerning the $20 offer was not originally part of his story. When Perry, Ebens and Nitz reached McDonald's, Perry saw Highland Park police officers Gardenhire and Roberts who were at the time acting as private security officers for the McDonald's restaurant. Perry appears originally to have denied to the officers that he had been with Ebens and Nitz but then admitted that he was in their company but was assisting them to get Nitz to the hospital. Statements given initially did not include the offer of $20, or so it was claimed. Ebens asserts that he was unduly restricted in his cross-examination of the officer concerning the inconsistent statements.

Similarly officer Gardenhire, who was present at the scene and testified in great detail as to the onslaught itself outside of McDonald's and on Woodward Avenue, was cross-examined very closely concerning prior statements he had made about the exact manner in which Ebens had assaulted Chin and particularly whether he had been trying to hit Chin on the head or elsewhere on the body. Cross-examination did bring out that Gardenhire admitted that he may have made somewhat different statements earlier but Gardenhire denied that he had made any statement to a television newsreporter that he was dissatisfied with the outcome of the state court prosecution. This question was undoubtedly aimed at showing some bias on Gardenhire's part which would have colored his recollection of the ferocity and particulars of the assault with the bat. When counsel sought to introduce video tape recordings showing Gardenhire's statements on television indicating such dissatisfaction, he was precluded, again on the basis that the evidence

was hearsay. If the defense is correct, the video tape would have been admissible, if properly preserved, as bearing upon credibility of the witness. At the same time, we must observe, particularly with respect to the endeavor to introduce Perry's out-of-court statement, that Perry himself quite readily acknowledged that he had not at first mentioned the $20 offer to the police. Similarly with respect to officer Gardenhire, the trial court's exclusion of his testimony would not of itself be cause for reversal especially since it appears to have had some but not great relevance. The severity of the attack seems to be unquestioned although in a close case it could bear upon the question of the intent with which Ebens attacked Chin.

### V.

The defendant next claims that the trial was interspersed with incidents of prosecutorial misconduct mandating reversal. The government defends the conduct of its prosecutor and makes the point that the defense, having failed to object contemporaneously, may not do so now.

The best starting point for an evaluation of the prosecutorial misconduct claims here, is a repair to the recently decided *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Specifically in issue in *Young* was the extent to which it is necessary to make timely objections to the prosecutorial conduct deemed improper in order to preserve them for potential reversal on appellate review. While the effect of *Young* was to reinstate a jury verdict of guilty upon a finding that certain statements, although improper, did not amount to plain error, any government attorney, reading the opinion carefully, can have no doubt whatever of the Supreme Court's continued dedication to its historic insistence that prosecutors representing the United States in criminal prosecutions should refrain from improper conduct calculated to produce a wrongful conviction. *See Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

We need not determine whether the instances of misconduct complained of here, which we believe are far more egregious than those examined in *Young*, would have brought about reversal on a plain error basis since the conviction must in all events be reversed. Most of the complaints of misconduct, however, are directed to the closing argument of government counsel and, as the government points out, most occurred without specific objection by the defense.

As to the failure to object during the course of the government's closing arguments, Chief Justice Burger, with great wisdom we think, observed what has been universally recognized by practitioners, that "interruptions of arguments, either by an opposing counsel or the presiding judge, are matters to be approached cautiously." *Young*, 105 S.Ct. at 1046. The reason obviously is that such interference with counsel's right to address a jury is often resented by both the court and the jury and even where justified, produces the adverse effect of emphasizing the objectionable matter. However, Chief Justice Burger did follow the above quotation with the comment that "[a]t the very least, a bench conference might have been convened out of the hearing of the jury once defense counsel closed, and an appropriate instruction given." *Id.* Because the present case must be retried, however, we deem it necessary to register most strongly our disapproval of the inflammatory language employed by government counsel. *United States v. Young* makes it plain that the object of a fair trial is for counsel for both the government and defense to confine themselves within the bounds of professional ethics in presenting their arguments to the jury. The failure of one side to observe the rule does not confer on opposite counsel the license to "right the scale" by engaging in equally inappropriate conduct. In this respect Chief Justice Burger repeatedly calls attention to the obligation of the court on its own motion and on its own initiative to assure that neither the defense nor government counsel tran-

scends the bounds of ethics and lawyer-like propriety.

It is clear that counsel on both sides of the table share a duty to confine arguments to the jury within proper bounds. Just as the conduct of prosecutors is circumscribed, "[t]he interests of society in the preservation of courtroom control by the judges are no more to be frustrated through unchecked improprieties by defenders." Defense counsel, like the prosecutor, must refrain from interjecting personal beliefs into the presentation of his case. Defense counsel, like his adversary, must not be permitted to make unfounded and inflammatory attacks on the opposing advocate....

\* \* \* \* \* \*

We emphasize that the trial judge has the responsibility to maintain decorum in keeping with the nature of the proceedings; "the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct." *Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933). The judge "must meet situations as they arise and [be able] to cope with ... the contingencies inherent in the adversary process." *Geders v. United States, supra,* 425 U.S. [80,] 86, 96 S.Ct. [1330,] 1334, 47 L.Ed.2d 592. Of course, "hard blows" cannot be avoided in criminal trials; both the prosecutor and defense counsel must be kept within appropriate bounds.

*Id.,* 105 S.Ct. at 1043–44. (Most citations omitted.) (Footnote omitted.)

*United States v. Young* makes repeated references, with approval, to the ABA Standards for Criminal Justice (2d ed. 1980). Rather than repeat them once more here, we refer trial counsel and the court to footnotes 5, 6, and 7 at page 1043 of the *Young* opinion. We can think of no better expression of the ethical principles which should guide an attorney in his representation of the United States.

As *Young* makes clear,

[t]he plain error doctrine of Federal Rule Criminal Procedure 52(b) tempers the blow of a rigid application of the contemporaneous objection requirement. The Rule authorizes the Courts of Appeals to correct only "particularly egregious errors," *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982), those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings." *United States v. Atkinson,* 297 U.S. [157,] 160, 56 S.Ct. [391,] 392, 80 L.Ed. 555 (1936).

*Id.,* 105 S.Ct. at 1046–47. (Footnote omitted.)

 The principal message of *Young* is that in reviewing prosecutorial misconduct for plain error, it is necessary that the error be measured not within the narrow confines of the argument but against the entire record. "It is simply not possible for an appellate court to assess the seriousness of the claimed error by any other means." *Young,* 105 S.Ct. at 1047. Accordingly, we have carefully reviewed the entire record and against the background of all of the evidence. It must be remembered at the outset that the case itself arose in an atmosphere of extraordinary publicity. The video tapes contained as part of the special record made with respect to the motion for a change of venue, demonstrate the deep sense of public outrage especially after it was perceived that the Chin incident was motivated by racial bias. Nearly every news telecast showed the pathetic figure of Chin's weeping mother making pleas for justice. There are countless photographs of marches and demonstrations in front of both the county office buildings and the federal office buildings in Detroit, some, according to the accounts, attracting over 700 persons carrying large placards. The city council of Detroit was shown awarding a memorial plaque to Chin's mother in affirmation of its dedication to a bias-free administration of justice. The mayor of Highland Park was quoted as critical of the state's investigation. There were many videotaped news recordings showing Lisa Chan and reporting particularly the claim made by her committee that the state trial

judge had been deprived of essential evidence in sentencing Ebens, evidence which if known would have induced him to impose a heavier sentence.

Every stage of the proceeding was followed with great care by the media. It was even noted that the incident was prominently featured in the press as far away as San Francisco and Hong Kong. Almost nothing was said which would have been derogatory concerning Chin or which would have carried the defendant's own version of the events leading up to the ultimate tragic climax. Every element of the population was queried in the news media concerning its reaction; that reaction was almost without exception condemnatory of Ebens. There were videocasts showing purported auto workers or others in Detroit paying or making donations for the privileges of attacking Japanese-made automobiles with sledgehammers as showing some of the uncontrolled spleen directed at the competition from Japanese imports.

We mention these elements not because we conceive that there can be any justification whatever for the assault which took place nor because the government prosecutor was chargeable with any part of the massive publicity. Likewise we recognize fully that this was a public event and a matter of great and crucial importance to the Detroit metropolitan area. We do not remotely suggest that there should be any inhibitions on the First Amendment rights of the media to report matters of such great public importance. We mention these circumstances, however, only to show that a heightened sensitivity on the part of the prosecutor was necessary if the values of a fair trial under such explosive circumstances were to be preserved. Of the jurors, only three professed no knowledge of the incident at all. The others had all been exposed to one extent or another to the massive publicity which continued right up to and through the trial itself. Plainly, it seems to us, the government attorneys were under a very special burden of responsibility to make sure that their own conduct did not contribute to what was

already a very great risk that the verdict would be the product not of the evidence but of public dissatisfaction with the earlier state court sentence.

The closing arguments of the government counsel began as a model of aggressive yet entirely fair advocacy. His review of the evidence was careful and made telling use of inconsistencies in the stories and arguments of the defense. It was a classic example of the hard but fair blows recognized in *Berger*. As he progressed, however, he took advantage of the rulings of the trial court to make impermissible inferences from evidence which ought either to have been kept out of the trial or, if admitted, to have been held to a limited use.

Thus while we have already held that it was error to have excluded the Chan tapes, had those tapes been played they would have indicated an effort on the part of Lisa Chan to orchestrate the testimony of the witnesses who attended the meeting so that they would appear to be sufficiently diverse in character as not to sound rehearsed and yet would include all the essential elements to prove a racial bias. The prosecutor then took advantage of the excluded testimony by making the following comment which might otherwise be entirely proper:

> Now ladies and gentlemen, this probably doesn't need to be said; but just because these witnesses heard different things at different times doesn't mean they contradict each other. Naturally, when the music was loud and their perspectives were different, when they were paying different degrees of attention, they wouldn't hear or recall the exact same things. No, they don't contradict each other. You should worry if they came in here and said, yes, I heard the exact same thing. Now they corroborate each other, because the one thing that they all heard was that Vincent Chin was never aggressive or hostile....

Had the jurors been permitted to hear the tapes of Lisa Chan's joint witness inter-

view of May 17,[4] they would have had at least a means to determine whether the witnesses' testimony was in fact correct or the extent to which it was coached. Excerpts from that interview are appended hereto as appendix A and show the nature of the coaching which took place.

Government attorney Mr. Merritt then proceeded with a very strong point bearing on the existence of Ebens' guilt under the federal act: the evidence that Ebens and Nitz appeared to have singled out for pursuit only the Orientals, Vincent Chin and Jimmy Choi, and to have left their white companions largely undisturbed. This evidence of Ebens' bias was further fortified by emphasis on the testimony that Jimmy Perry was offered $20 to, as Mr. Merritt characterized, "help catch those Chinese guys." Thus the $20 offer and the reference to Chinese guys was a very vital part of the government's attempt to show express bias against Orientals and that there was calculation which precluded any excuse of spontaneous anger centering on a fight over the dancing girls at the bar. We do not fault the prosecutor for forcefully emphasizing this evidence once it had been allowed in by the trial court. At the same time it can be seen that the successful efforts to exclude evidence concerning Jimmy Perry's initial failure to mention to the police officer anything about the $20 and the request to find "the Chinese guy" had to have at least an important bearing on the credibility of Perry's testimony. The error in restricting the cross-examination is apparent.

■ Up to this point, therefore, we conclude that the prosecutor had stricken harsh blows but fair ones, especially in light of the evidence which was admitted. We point up the foregoing arguments only as showing the prejudicial effect of the admission of the evidence or the limitation on cross-examination and not on the conduct of the prosecutor himself. However

when Mr. Merritt came to discussing the Willie Davis incident his argument went far beyond what we believe to be the permissible inferences of the proof submitted concerning that incident. After pointing to some of the evidence from which the inference of identity could be made, he argued strongly that Ronald Ebens came into the bar that night where Willie Davis was having a drink and "started calling him a nigger and a black son of a bitch" and accusing him of chasing white women. He then argued very forcefully that Davis had been intimidated from testifying by improper defense pressures when they sought to interview him:

> You heard Willie Davis testify that the FBI interviewed him three times, once in my firm, and that we wanted him to be a witness for the government. And you also heard him testify that after he was visited by the defense investigator that weekend before he was going to testify, that they waived [sic] his police record in front of him, and they said they had spoken to Ronald's friends, they knew nothing about this. Well, Willie Davis was a lot more reluctant to positively ID Ronald Ebens. But you know why Willie Davis lost his memory about that.

The prosecutor thus took full advantage of the fact that the trial court had failed to caution the jury about the out-of-court statements inferentially attributed through government questioning to Willie Davis. The impermissible hearsay was thus elevated to substantive proof without restriction and the purported reason for using it was only peripheral at best.

■ The government counsel also took unfair advantage, in our view, of the restrictions upon the use of the transcripts of the Lisa Chan interviews by inferring that the defense had endeavored to use only selected portions of the tapes so as to keep their impact from the jury. Thus he argued

---

**4.** There is a discrepancy in the record regarding the date of this interview. In their briefs to this court, both parties state that the interview took place on May 17. However, the date typed on the portion of the transcript of the interview reproduced in the joint appendix contains the date April 13.

[t]he defense selected lines from these voluminous transcripts, lines where they may have said something different on occasion. But how many times were those lines taken out of context, when they were trying to impeach Bob Sirosky and Jimmy Choi, where they left out part of the proceedings, where there were answers on the tape, and they said there was an interruption on the tape? How many of these inconsistencies are really about minor things like whether or not he said you son of a bitch or mother fucker.

The government also chided the defense for not putting in the entire tapes while knowing it had been prevented from doing so by the court's adverse ruling on admissibility.

The injection of the Davis incident had the effect of suggesting a negative attitude toward blacks on Ebens' part. In addition the prosecutor pointed out that one of the witnesses who saw Vincent Chin was herself black and later testified that she saw the defendant with a baseball bat. The obvious strategy was continued in arguments which the prosecutor then made that "this was more than some barroom fight. This was violent hatred turned lose [sic]. This was years of pent-up racial hostilities and rage unleashed. This was a modern-day lynching, but there was a bat instead of a rope."

The government prosecutor became more strident in his remarks after the defense had finished its summation. In a series of comments on the evidence, some of it disputed, the prosecutor preceded each comment with the term "We know," such as "We know that Ebens and Nitz went after Jimmy Choi and not his white counterparts ... that Ebens said that he would have gotten [Choi] too if they hadn't stopped him ... that they offered Jimmy Perry $20 to get those Chinese guys." He then went on to observe that "We're not Niggers; we're not Kikes, we're not Polaks, we're Americans. And as Americans, we must condemn this type of racial violence." He then closes by saying, "Now these defend-ants have had a fair trial and now it's up to you to do your duty, to hold them responsible for their actions."

■ The employment by the prosecutor of comments which represent his "personal impression" are, as pointed out by Chief Justice Burger in *United States v. Young,* directly violative of the American Bar Association's standards for criminal justice that "[i]t is unprofessional conduct for a lawyer to express a personal belief or opinion in his client's innocence or personal belief or opinion in the truth or falsity of any testimony or evidence, or to attribute the crime to another person unless such an inference is warranted by the evidence." *Id.* 105 S.Ct. at 1043 n. 7 (quoting *ABA Standards for Criminal Justice* 4–7.8(b)).

With respect to personal impressions, Chief Justice Burger observed in *Young,* "[n]otwithstanding the defense counsel's breach of ethical standards [engaging in similar conduct] the prosecutor's statement of his belief that the evidence showed Apco had been defrauded should not have been made; it was an improper expression of personal opinion and was not necessary to answer defense counsel's improper assertion that no one on the prosecution team believed respondent intended to defraud Apco." *Id.* at 1048. Also while recognizing that such argument may not always be reversible, Chief Justice Burger specifically held that "[t]he prosecutor was also in error to try to exhort the jury to 'do its job'; that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice." *Id.* Thus, it appears that the prosecutor's comments again violated the ethical standards as reaffirmed in *Young* and defined by the American Bar Association. *ABA Standards for Criminal Justice,* at 3–5.8(c) and 4–7.8(c).

Two other complaints by appellant merit further comment.

One of the defense witnesses was a nude dancer at the club, Angela Rudolph, whose stage name was Starlene. It was Starlene's testimony that she was the subject

of derisive remarks made by Chin, remarks which triggered Ebens into the quarrel.

During its case-in-chief government counsel produced testimony from Sharon Fleming, a dancer at the Fancy Pants Lounge, that Ebens had engaged in an act of oral sex with Starlene. Both Ebens and Starlene flatly denied the charge and it was otherwise uncorroborated. Because Starlene had testified favorably to Ebens' theory of defense, the government attorney on rebuttal argument attacked her credibility and observed, "Ms. Starlene is not known for her truthfulness among the circle that she travels in, and the law enforcement agency, her friends and her co-workers. And ladies and gentlemen, her defensive denial that she would never let anyone touch her, let alone have oral sex with her, well, that shows you how much stock she puts in telling the truth here, under oath."

■ We recognize that the sociological standards of those who frequent or entertain at places such as the Fancy Pants Lounge are likely to be substantially foreign to the experiences of most jurors and that what occurs in such places is almost certain to offend some. We think that, unless absolutely required by the needs of the case, the government erred in initiating testimony concerning this conduct. Evidently it was determined to destroy the credibility of the witness by showing that she and the defendant had engaged in an act of oral sex. Such evidence is so likely to offend the normal sensibilities of the average juror as to leave us in serious question whether it should not have been immediately the subject of sua sponte correction by the trial judge. Arguably there may have been some relevance to the testimony, such as showing that Starlene and Ebens enjoyed a special relationship and that therefore her testimony might favor him. And it is also true that broad latitude concerning the circumstances in which a crime occurs, must necessarily be allowed, even though it brings in the bizarre, the unpleasant, and the distasteful. *Cf. United States v. Brady*, 595 F.2d 359 (6th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 129, 62

L.Ed.2d 84 (1979). We think, however, that injection of such evidence in this case was highly objectionable as tending to demean the witness and also as tending to depict the defendant in a depraved light before the jury, and thus to distract the jury from its very real task of determining whether Ebens acted with the requisite specific intent under the statute.

## VI.

■ Numerous other claims of error are made, and we have reviewed them all. Without endeavoring to comment expressly on each, we do conclude that the trial court did not abuse its discretion by excluding a letter written by United States Attorney Leonard Gilman on July 6, 1983, explaining his personal opinion that there was insufficient evidence to support the government's prosecution in this case. This is classic hearsay, was totally irrelevant to the issues before the jury, and was properly excluded. We likewise find no merit in the claim that defendant was improperly held twice in jeopardy for the same offense. It is firmly established under the dual sovereignty doctrine that "an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both, and may be punished by each." *United States v. Lanza*, 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922). In any event the federal civil rights offense requires proof of facts substantially different from manslaughter, *Blockberger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), so there is no support for the proposition that double jeopardy was implicated here in any way.

REVERSED and REMANDED for a new trial.

### APPENDIX A

Excerpts from joint witness interview of May 17, 1983:

"Liza [sic] Chan: The purpose of this meeting tonight is so we can help each other remember exactly what happened, how it happened, when it happened and all the minor details. We were just going over—I

was talking with Eddie Hollis this afternoon, the parking lot attendant, the black guy, I don't know when he came in. I think—but according to his version of the facts, it's quite different from what I have so far understood them to be. So, I would center on my facts on what you, three of you, say they are and somehow try to either fit all the facts around these, or if they don't fit, then I have to watch out, you know, there's something else, somebody's saying something else."

\* \* \* \* \* \*

"Liza [sic] Chan: We will agree this is the story, this is it. When it's a federal prosecution, h'm, we're all going to have to be agreeing on this is what happened. Now, if you don't agree, like I explained to them earlier, you definitely remembered certain things happened, say, it's a black car and you definitely remembered it's a white car and we kind of (inaudible), okay, other than that, let's all have it sort of down, have it down pat, is it five minutes or is it ten minutes. Is it more like eight minutes, let's all agree. Otherwise, you all look funny on the stand. You all supposedly were there. But one says two minutes, the other says eight and that's what robbed me before."

\* \* \* \* \* \*

"Gary Koivu: Is there any harm in getting too accurate, because they could say, well, you all rehersed [sic] this, like if you're in court and we all have exactly the same times.

"Liza [sic] Chan: As long as you're within, you know, you could say 8:10, you could say 8:20, I mean, that doesn't matter.

"Gary Koivu: Mm hmm. Right, but as long as they have example.

"Liza [sic] Chan: Right. But as far as the crucial facts, the crucial ones are not conflicting. I'll give you an example. Like what you've people have been telling me and then what Eddie Hollis told me. Totally make me completely confused. That is going to be raising a question in the jury's mind: well, who's telling the truth? Or what actually happened. Maybe nobody's

to be believed. Now, I don't mean exactly everybody agreed okay, everbody [sic] agree at 6:30 right on the dot.

"Robert Siroskey [sic]: Mm hmm.

"Liza [sic] Chan: This could have a little bit of leeway.

"Robert Siroskey [sic]: Okay.

"Liza [sic] Chan: Okay. H'm, but I mean, you know, you can't say that we stayed at Fancy Pants for two hours and then another person says we stayed at Fancy Pants for half an hour. I mean that's a big discrepancy there.

"Robert Siroskey [sic]: Right."

\* \* \* \* \* \*

"Liza [sic] Chan: H'm, also, you don't have to volunteer any information. Well, Jerry Craig [FBI agent] may be slightly different because we do want to facilitate in terms of investigation. The question is not whether it is a murder or justifiable, the question is whether there was any reason that they—Vincent was bothered at all, let alone killed, because of his race, bothered from enjoying the services and entertainment because of his race. So, right now, it's not whether there's sufficient cause, who [inaudible] whether—it's still essential that you know, the essential point is that Vincent didn't fight back, or, you know, being chased, just fled. And those are still essential. We're not going to say, well, now, since that's the case, we don't have to say anything good for Vincent, just the truth. If he's good, he's good; if he's bad, he's bad. If he's semi-bad, he's semi-bad. Don't volunteer information. If the guy didn't ask you, or whoever, didn't ask you, did they have any words exchanged when Ebens and Nitz walked out? You don't have to say it. They say, what happened next? Ebens and Nitz were escorted out. Okay. And then went to the car and they took out a baseball bat. Unless someone says did anybody say anything, or did anything happen in between, you don't have to volunteer. You don't have to unless you're asked."

\* \* \* \* \* \*

"Liza [sic] Chan: Then he started out of the chair?

"Gary Koivu: Yeah.

"Jimmy Choi: He ran over.

"Gary Koivu: Yeah.

"Liza [sic] Chan: So, that's—you remember

"Robert Siroskey [sic]: That's why I remember just before he got up, he says: don't call me a motherfucker. I remember that.

"Liza [sic] Chan: Okay. We all remember our different lines, okay. There's no agreement that that's fine, just remember your different lines—

"Robert Siroskey [sic]: Right.

"Liza [sic] Chan: Chink, foreign car part, big fucker, little fucker, all fuckers, don't call me a fucker, we all remember our lines, okay? Umm, then what happened? Go ahead."

\* \* \* \* \* \*

Lisa Chan Maybe you heard that before: don't call me a fucker.

Robert Sirosky See, I have to go with what he said.

Lisa Chan Wait a minute now. That might make sense. Little fuckers, big fuckers, we're all fuckers.

Robert Sirosky Mm hmm.

Lisa Chan Then VINCENT could have said: don't call me a fucker. Could be. I'm just saying—

Gary Koivu No, I'm just saying what I— like I said, I'm not saying I saw everything, but I did see—

Lisa Chan But what you did hear or did hear, was after the words: don't call me a fucker, I'm not a fucker.

Gary Koivu Mm hmm.

Lisa Chan So, but you did remember hearing something about little fuckers and big fuckers, we're all fuckers.

Jimmy Choi Mm hmm.

Gary Koivu Yeah.

Lisa Chan And you, same thing?

Robert Sirosky Yes. I remember hearing something to the effect that—

Lisa Chan Coming from EBENS or NITZ. Coming from EBENS or NITZ?

Robert Sirosky Who's EBENS? Who's NITZ? I don't—

Gary Koivu EBENS was the big guy.

Lisa Chan Is it the big guy?

Gary Koivu The older guy.

Robert Sirosky The older guy.

Lisa Chan Okay.

Jimmy Choi The blond haired guy.

Lisa Chan Okay. Let's presume that he said—let's presume that he said chink, let's presume you heard something about foreign cars, let's presume also that you—I'll let the jury decide who said what first, but let's also presume that you heard EBENS saying big fuckers, little fuckers, we're all fuckers. Both of you heard that.

Robert Sirosky Right.

Lisa Chan Then maybe at that point VINCENT said don't call me a fucker, I'm not a fucker.

Gary Koivu Was made me presume that VINCENT said something to—maybe VINCENT, perhaps, called him a fucker. Why would he all of a sudden say big fuckers, little fuckers, we're all fuckers? I was under the impression that VINCENT wasn't saying anything to this guy until—

Lisa Chan Mm hmm, mm hmm.

Gary Koivu —he said, whatever he said, and VINCENT said, don't call me a fucker, I'm not a fucker.

Lisa Chan Well, it could be afterwards, too. Don't call me a fucker, I'm not a fucker. EBENS could have said big fuckers, little fuckers, we're all fuckers. No?

Gary Koivu I sure would have seen it. I was sitting right next to VINCENT—

Lisa Chan That didn't blow over—

Gary Koivu —and looking right at EBENS.

Lisa Chan Well, any suggestions? We're all sure what we heard? That's okay, I mean, that's fine, too. I just—

Robert Sirosky I'm positive—

Lisa Chan —while I have all three of you—

Robert Sirosky I'm positive what I heard after VINCENT said that.

Gary Koivu Yeah, what VINCENT said after that.

Lisa Chan Okay. We rely on you whatever was said afterward.

Gary Koivu Before that VINCENT said I'm not a fucker—

Lisa Chan Right.

Gary Koivu I'm out of it, you know, these two.

Lisa Chan You weren't paying attention.

Gary Koivu See what they heard.

Lisa Chan At some point you heard chink definitely, for sure.

Robert Sirosky Right, right.

Lisa Chan Could it be into the fight?

Robert Sirosky Into the fight? No.

Robert Sirosky We're all sitting—

Lisa Chan Sitting.

Robert Sirosky Yes.

Lisa Chan Still things are going fine. The first thing you heard was something about chink.

Robert Sirosky Mm hmm.

Lisa Chan Fighting and all other words came later?

Robert Sirosky Mm hmm.

Lisa Chan You heard something about foreign cars; that's also the same situation, not in the middle of the fight or anything, or in the middle of an exchange?

Robert Sirosky There's a lot of destractions [sic], too, because the music is loud—

Jimmy Choi The people—

Robert Sirosky —The people

Jimmy Choi —were around, girl dancing—

Robert Sirosky —girls dancing.

Jimmy Choi —and then—he and I were talking.

Lisa Chan All right, then, the next thing. We've got all these lines.

Gary Koivu I told you I tapped VINCENT on the arm saying forget it, you know,—

Lisa Chan Okay.

Gary Koivu —I may have said, it's not important.

Lisa Chan Right. And?

Gary Koivu And when EBENS said, you know, I just don't know if you're a big fucker, little fucker—

Lisa Chan Makes sense.

Gary Koivu —and that's when VINCE—

Lisa Chan Makes sense, makes sense. If he had said big fuckers, little fuckers, we're all fuckers, if he had said that, by the time you heard: I just don't know whether you're a big fucker or little fucker, he was referring to something that he had said before.

Gary Koivu Yeah, I never heard anyone say it.

Robert Sirosky Yeah, right.

Gary Koivu So may have—

Robert Sirosky Exactly.

Lisa Chan I'm just guessing, it's just logic. You know, I could be wrong. Okay, so he said: I just don't know whether you're a big fucker or a little fuckers? Because he had earlier said big fuckers, little fuckers, we're all fuckers—

Gary Koivu Maybe that's how they thought they heard that.

Lisa Chan —I just don't know whether you're a big one or a little one.

Robert Sirosky Right.

Gary Koivu Yeah, could be.

Lisa Chan Okay.

Gary Koivu But after I tapped him and EBENS said, I just don't know if you're a big or little fucker, that's when VINCENT said I told you I'm not a fucker, friend.

Lisa Chan Did anybody hear that?

Robert Sirosky I didn't hear it, but, you know, he's talking to him and, you know, I might have saw him point out of the—no, I can't say something like that—

Jimmy Choi I think I heard him say nobody calls me a mother fucker.

Robert Sirosky —I can't even say that.

Lisa Chan Mm hmm.