NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0340n.06

No. 13-5746

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Apr 29, 2014

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| VICTOR ZERTUCHE, | ) | TENNESSEE. |
| | ) | |
| Defendant-Appellant. | ) | |

_____/

**Before: GUY, GIBBONS, and GRIFFIN, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.** Victor Zertuche was convicted by a jury of two drug offenses arising out of the seizure of almost ten kilograms of cocaine being transported by his two codefendants in a rental car. Appealing his convictions, defendant argues that plain error resulted: (1) from the admission of hearsay and opinion evidence; and (2) from comments by the prosecutor regarding the evidence in opening statement and closing argument. Zertuche also challenges the sufficiency of the evidence to support his convictions. For the reasons that follow, we affirm.

## I.

The two-count indictment charged defendant Victor Zertuche and codefendants Alberto Yebra and Benjamin Poncedeleon, Jr., each with conspiracy to possess with intent to distribute, and possession with intent to distribute, at least five kilograms of cocaine on or about March 26,

2012. *See* 21 U.S.C. §§ 846 and 841(a)(1). On the morning of March 26, 2012, Yebra and Poncedeleon were stopped for speeding while traveling in a rented Toyota Camry on I-40 east of Memphis, Tennessee. The stop led to the discovery and seizure of what was stipulated at defendant's trial to be 9.987 kilograms of cocaine. Yebra and Poncedeleon pleaded guilty and testified that they were knowingly transporting cocaine from Texas to North Carolina. The government maintained that they were transporting the cocaine at the behest of unindicted coconspirator Juan Adan, and that Zertuche traveled the same route in a separate car to direct them to its destination in Charlotte, North Carolina.

At the conclusion of a three-day trial, the jury found defendant guilty of both charges and specifically found that the offenses involved at least five kilograms of cocaine. Defendant obtained new counsel and moved for an extension of time to file a motion for new trial. The Extension was granted, but the district court denied defendant's post-verdict motion, which sought, in the alternative, judgment of acquittal under Fed. R. Crim. P. 29(c), or a new trial under Fed. R. Crim. P. 33. Defendant was sentenced to concurrent 132-month terms of imprisonment, and this timely appeal followed.

## II.

After being blamed for some missing marijuana, Yebra found himself indebted to a drug dealer named Juan Adan. Yebra met with Adan to pay a portion of that debt in February 2012. A few days later, Adan called Yebra and offered to pay him $10,000 to transport drugs from Texas to North Carolina. Yebra accepted and, in turn, enlisted Poncedeleon to do the driving.

On March 25, 2012, Poncedeleon drove Yebra in a rented Camry to a designated meeting place in San Antonio, Texas. From there, they proceeded to a home in nearby New Braunfels,

Texas, where Adan gave them ten packages of cocaine to transport. Poncedeleon loaded the cocaine into the Camry, hiding two packages in the dashboard and eight packages under the lining in the trunk covered by some tools. Adan did not tell Yebra specifically where or to whom the drugs were to be delivered, but told Yebra that the person they would meet in North Carolina "looked like kind of Cuban."

Before they left, Adan instructed Yebra to meet someone in a black car at an Exxon station, and gave Yebra a contact telephone number. When no one met them there and no one could be reached at that number, Yebra called Adan and was given a different telephone number to call (one with a 210 area code). Using that number, Yebra arranged a meeting at a Whataburger restaurant in San Marcos, Texas (north of San Antonio). Defendant Victor Zertuche arrived to meet them in a small black car, which had North Carolina license plates and was driven by a woman who would turn out to be defendant's wife.[1]

Yebra and Poncedeleon testified that defendant told them that they were going to Charlotte, North Carolina, and that he would direct them where to go. But, defendant did not specifically mention the cocaine or discuss either its delivery or its intended recipient. Leaving there in the Camry, Poncedeleon did the driving, while Yebra communicated with defendant by phone and text message. Defendant traveled the same route in the black car, and defendant's wife, Claudia Santos Zertuche (Santos), testified that she drove while defendant texted and called constantly. Yebra and defendant advised each other about any police on the road, and defendant warned them not to speed. Although the two cars traveled the same route, they did not stop at any of the same places along the way.

---

[1]There was no evidence of the communications between Adan and the defendant, although there were references to Adan's relationship with defendant's sister. It was not until months after their arrests, however, that defendant told Yebra and Poncedeleon that Adan was his brother-in-law.

Yebra texted defendant later that night to say they wanted to stop in Arkansas, but defendant told them to keep going because he had driven ahead and there were no police on the road. Yebra testified that they stopped for a short rest anyway, but told the defendant only that they had stopped to put air in a low tire. Finally, in the early hours of March 26, Yebra let defendant know that they were stopping, and defendant responded that he would stop too. Defendant was ahead of them and stopped in the Nashville area. Poncedeleon and Yebra had a nap and then resumed driving until they were stopped for speeding at approximately 8:00 a.m., east of Memphis, Tennessee.

Yebra testified that he called the defendant as they were being stopped. Subsequent analysis of the relevant call records showed that defendant received a call from Yebra at approximately 8:00 a.m., and that defendant then called a number used by Adan. In turn, several calls were made from Adan's number to Yebra's number, but those calls were not answered or went to voice mail. Once the cocaine was discovered, Poncedeleon and Yebra decided to cooperate and provided information about the defendant.[2]

DEA Agent David Lytal took Yebra's phone, noted the incoming calls from the number associated with Adan and from the number defendant had been using to communicate with Yebra. A plan was devised to try to get defendant to meet them. Yebra used his phone to text defendant at one number (one with a 210 area code) and got calls back from defendant from two other numbers (with area codes 615 and 704).

---

[2]Poncedeleon reportedly told the officers that he knew how to "help himself" because his father was a border patrol agent. Defendant argued in his motion for new trial that it was error to allow such testimony, but has abandoned the claim on appeal. Poncedeleon also testified at trial that he was just the driver and could not say whether defendant knew about the cocaine.

Through those exchanges, defendant asked about the stop and whether Yebra was sure that everything was "all right," and Yebra assured him that they had been let go with just a speeding ticket. Using a ruse, Yebra told defendant that the Camry had a blown tire. Specifically, Yebra testified that he asked defendant to bring them a tire jack because they were at a gas station and did not want to take "the stuff"—referring to the cocaine—out of the trunk. Although defendant and his wife were already in the Nashville area, approximately 100 miles farther east, defendant agreed to double back to bring them a jack.

DEA Agent Rod Waller explained that the Camry was taken to a gas station and air was let out of one of its tires. Defendant arrived in the black Nissan Versa driven by Santos and parked by some gas pumps, where they waited in the car for approximately ten minutes. After Santos moved the car to the front of the store, defendant got out, took a jack from the back seat, and walked to the north side of the building, around the back, and along the south side of the building to where the Camry had been parked. Waller described defendant's actions and added that, in his opinion, defendant was looking around for "surveillance." Yebra testified that he saw defendant approach the Camry, slide the jack under the car and walk away.

Zertuche and Santos were placed under arrest, although Santos was not charged. An inventory search of the black Versa resulted in the seizure of several relevant papers. Those papers included: an undated receipt for a hotel near Nashville, which was where Santos testified she and defendant stopped on March 26 so she could shower and rest; a Google Maps printout of directions to a Boost Mobile cell phone store in the Nashville area; and a business card for the manager of that store by the name of Heider Vargas. Agent Lytal testified that he took an investigative subpoena to the cell phone store, and Vargas confirmed that the defendant had

purchased a prepaid SIM card for the number with a 704 area code that had been used to call Yebra.

Defendant did not testify at trial, but presented testimony from his wife Claudia Santos; his brother Marcos Zertuche; and a friend named Christy Morales. Morales said defendant had helped her by driving her and her family, including leading her mother in a second car, to Texas without charge. Defendant's brother owned a framing company, which was associated with one of the phone numbers used by defendant, and confirmed that defendant had worked as a framing carpenter for him and for others in North Carolina. He also said defendant worked for, and rented from, someone named Oscar.

Santos testified, with the aid of an interpreter, that she met the defendant in Texas and had moved to live with him in North Carolina about six months before the events at issue. Asked about "Oscar," Santos said he was a friend of defendant's for whom defendant had done some roofing work and with whom she and defendant stayed briefly when she first moved to North Carolina. Through Santos, defendant offered an innocent explanation for why they were traveling when they did. Santos testified that they made the trip from North Carolina to Texas to visit family, but had cut the trip short because she was pregnant and was having problems related to the pregnancy. She added that defendant also told her that he needed to get back for work. Santos acknowledged that defendant met two men at a Whataburger before leaving Texas on March 25; that defendant went to two cell phone stores in the Nashville area to "fix" his phone before they stopped at the hotel on March 26; and that it was the defendant who decided they would backtrack to the gas station where the Camry had been parked.

### A.    Sufficiency

We begin with defendant's sufficiency-of-the-evidence claim because it is to be assessed on the basis of all the evidence admitted at trial—whether admitted erroneously or not—and it cannot be avoided by a finding that trial errors occurred. *See United States v. Quinn*, 901 F.2d 522, 529 n.5 & 530-31 (6th Cir. 1990); *United States v. Arnold*, 486 F.3d 177, 180 (6th Cir. 2007) (en banc). We first must determine the proper standard of review.

The record reflects that defense counsel made a motion for judgment of acquittal at the close of the government's proof; however, that motion was not renewed at the close of all the evidence, or within 14 days after the guilty verdict was returned. *See* FED. R. CRIM. P. 29(a) and (c); *United States v. Kennedy*, 714 F.3d 951, 957 (6th Cir. 2013). Further, substituted counsel made a post-verdict motion seeking, in the alternative, judgment of acquittal under Rule 29(c), or a new trial under Rule 33, but had only requested an extension of time to file the motion for new trial. As a result, defendant's motion for judgment of acquittal under Rule 29(c) was untimely.[3]

Failure to preserve a challenge to the sufficiency of the evidence limits this court's review to whether there was a "manifest miscarriage of justice." *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998); *see also United States v. Jordan*, 544 F.3d 656, 670 (6th Cir. 2008). A manifest miscarriage of justice "exists only if the record is 'devoid of evidence pointing to guilt.'" *Price*, 134 F.3d at 350 (citation omitted). Here, there was overwhelming evidence that the conspiracy existed, that its object was being carried out when the cocaine was intercepted en

---

[3]Although the district court referred to this time bar as jurisdictional, it seems that it is more accurately described as a mandatory claims-processing requirement that may not be disregarded when the prosecutor objects, *see Carlisle v. United States*, 517 U.S. 416, 433 (1996), but which may be forfeited if the government fails to raise it until after the district court reached the merits, *see Eberhart v. United States*, 546 U.S. 12, 18-19 (2005). Here, the district court raised the issue without prompting by the government, but the district court also did not reach the merits. The government relies on the district court's finding on appeal.

route, and that defendant was actively involved in directing the travel of the coconspirators who were transporting the cocaine. Without repeating the evidence regarding defendant's interactions with his codefendants, we find that the record is not devoid of evidence pointing to defendant's guilt.

Further, even if the claim had been preserved, defendant would not be entitled to judgment of acquittal. In reviewing the sufficiency of the evidence, the court must view the evidence in the light most favorable to the government and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001). Defendant conceded that the evidence was sufficient to establish the existence of a conspiracy involving Yebra, Poncedeleon and Adan, but argued that it was not sufficient to establish that he knowingly and voluntarily joined that conspiracy.[4]

It is true that there is no evidence of defendant's explicit agreement to join the conspiracy. However, the agreement need not be formal, and "a defendant's participation in the conspiracy's common purpose and plan may be inferred from the defendant's actions and reactions to the circumstances." *Salgado*, 250 F.3d at 447. Also, once the conspiracy is established beyond a reasonable doubt, which is the case here, "the connection between the defendant and the conspiracy need only be slight." *Id*. In making this determination, the court

---

[4]The only argument regarding the substantive offense seems to be that, for the same reason, the evidence was not sufficient to establish the requisite intent. Proof that a defendant aided and abetted the possession with intent to distribute drugs requires that the government "establish that the defendant participated in the venture as something he wished to bring about and sought to make succeed." *Salgado*, 250 F.3d at 447.

does "not weigh the evidence, assess the credibility of the witnesses, or substitute [its] judgment for that of the jury." *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994).

It was undisputed that Adan gave Yebra and Poncedeleon the cocaine to deliver without specifying where or to whom, but sent them directly to meet with the defendant. They met with defendant as they set out with the cocaine, and defendant told them he would direct them where to go. There was evidence that defendant identified Charlotte, North Carolina, as their destination generally, and then guided them at a distance, advised them about the police on the road, discouraged them from stopping to rest, and traveled ahead of them until they decided to stop in the early morning hours. Also, as soon as defendant learned of the traffic stop, he called Adan, who then tried to call Yebra. Defendant used multiple phone numbers to contact Yebra, and doubled back 100 miles in the wrong direction to bring a jack to them at the gas station. Notwithstanding the assertion of innocent explanations for the concurrent travel, the circumstantial evidence was sufficient to lead a rational juror to conclude beyond a reasonable doubt that defendant was knowingly involved in shepherding the cocaine to an undisclosed destination in Charlotte, North Carolina.

**B.     Trial Errors**

Zertuche makes three claims of evidentiary error and one claim of prosecutorial misconduct, which are concededly subject only to plain error review because no contemporaneous objections were made at trial. *See* FED. R. CRIM. P. 52(b). To demonstrate plain error, a defendant must show (1) there was error (2) that was obvious or clear, (3) that affected the defendant's substantial rights, and (4) that, in our discretionary review, affected the

fairness, integrity, or public reputation of the judicial proceedings. *See United States v. Oliver*, 397 F.3d 369, 378-79 (6th Cir. 2005).

### 1. Lay Opinion

Agent Waller testified, without objection, that he observed defendant arrive at the gas station where the Camry was parked, sit in the car for as many as ten minutes, and then get out of the car, with the jack, and walk around the building while looking "for surveillance." Defendant's claim of error is based on the following exchange:

Q: So he walked all the way around the building?

A: Yes, sir.

Q: And what was he doing? He was carrying a jack?

A: Correct.

Q: Was he doing anything else?

A: No, sir, just looking around.

Q: Looking around?

A: Yes, sir.

Q: For what?

A: *Well, surveillance.*

Q: In your opinion?

A: Yes.

(Emphasis added.) Defendant argues that it was plain error to permit this lay opinion testimony because it was conjectural, speculative, and unfounded.

Lay opinion testimony admissible under Fed. R. Evid. 701 is limited to that which is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other

specialized knowledge within the scope of Rule 702." FED. R. EVID. 701; *see United States v. Freeman*, 730 F.3d 590, 595-96 (6th Cir. 2013). Such testimony is permitted because it describes "'something the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event.'" *Id.* at 595 (citation omitted).

Here, defendant contends that the opinion was not rationally based on Agent Waller's perception for several reasons, none of which we find persuasive. First, defendant suggests that there was no factual foundation for the opinion since Yebra testified that defendant placed the jack under the Camry and walked away. However, it is clear that Waller also witnessed defendant's conduct first-hand. Second, defendant argues that the only rational conclusion to reach from the fact that defendant was "looking around" was that he was looking for the Camry. Although this is an inference that could have been argued to the jury, Waller's opinion that defendant was looking around for surveillance was rationally based on his sensory and experiential observations. Defendant has not shown error in the admission of this testimony, much less plain error.

### 2.    SIM Card Purchase

Next, defendant argues that it was plain error to have admitted hearsay through Agent Lytal regarding information he received when he went to the Boost Mobile store located at the address on the map and the business card taken from the car in which defendant was traveling. When asked what he found, Agent Lytal testified without objection as follows:

> A: I actually spoke to – business card comes to Heider Vargas, he's the manager of the Boost Mobile. I went there and actually carried an evidence subpoena, and he provided me with the number that had been purchased, the 704 number that we had been receiving calls and calling to on the 26th and speaking with Mr.

> Zertuche. *They had bought a S[IM] card for that number at that business on the 26th.*
>
> Q: But not a separate phone?
>
> A: Not a separate phone, a card, a S[IM] card.

(Emphasis added.) The government argues that this was not hearsay because it was background information that was not being offered for the truth of the matter asserted. *See United States v. Caver*, 470 F.3d 220, 239 (6th Cir. 2006); *United States v. Aguwa*, 123 F.3d 418, 421 (6th Cir. 1997). Although it is not entirely clear, it does not appear to have been relevant to show why officers acted as they did, as would be typical of background evidence. Rather, it seems to have been offered to prove that defendant purchased a SIM card with a 704 area code on the day of the arrest that was used to communicate with Yebra. Thus, it appears that it was offered for the truth of the matter asserted.

Even if an objection had been made, however, the claim would be reviewed for harmless error. That is, defendant would have to show that it is more probable than not that the error materially affected the verdict. *See Caver*, 470 F.3d at 239. Here, other evidence established that defendant went to this cell phone store on that day. Also, although Santos said defendant lost his phone, she acknowledged that he was trying to "fix" his phone and then conceded that she did not really know what was wrong with the phone. More importantly, whether or not defendant purchased a SIM card from this Boost Mobile store, the evidence established that Yebra was communicating with defendant using several phone numbers and that those communications led to defendant's appearance at the gas station with the jack. We cannot conclude that the error, even if plain, was error that affected defendant's substantial rights.

### 3.  "Looked like kind of Cuban"

The next hearsay challenge is to Yebra's testimony that Adan told him that the man he would be meeting in North Carolina "looked like kind of Cuban."  The statement at issue was elicited by the prosecutor during the following exchange:

Q:  At that point, did you know where in North Carolina you were going?

. . . .

A:  Not until at the Whataburger.

Q:  And even then did you know – did you have an address?

A:  No, sir.

Q:  A name?

A:  No, sir.

Q:  Did you have a person – a description of the person you were supposed to meet?

A:  *Juan Adan had told me he looked like kind of Cuban.*

Q:  The person that you were supposed to meet in North Carolina?

A:  Yes, sir.

. . . .

Q:  Okay.  Did he give you any other description of this Cuban individual?

A:  No, sir . . . .

(Emphasis added.)  Since no objection was raised at trial, our review is for plain error.

The government argues that this out-of-court statement was not offered for the truth of the matter asserted because whether the intended recipient was Cuban was only marginally relevant to show defendant's involvement in the conspiracy.  Not only was there no attempt to

prove where or to whom the delivery was intended, but Yebra even testified that he thought they would be turning the cocaine over to the defendant in the end. Still, the purpose for which it was offered is not clear, and the government suggested in closing that it may not have been a coincidence that defendant knew a Cuban named Oscar who lived in North Carolina.

However, the government argues that the statement was not hearsay because the statement was "made by the party's coconspirator during and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E). To be admissible against defendant, the government must show by a preponderance of the evidence that there was a conspiracy, that the defendant was a member of the conspiracy, and that the declarant's statement was made in the course and in furtherance of the conspiracy. *United States v. Maliszewski*, 161 F.3d 992, 1007 (6th Cir. 1998). The only requirement defendant seems to contest is whether the statement was made in furtherance of the conspiracy.

"'A statement is made in furtherance of a conspiracy if it was intended to promote conspiratorial objectives; it need not actually further the conspiracy.'" *Id*. at 1008 (citation omitted). Examples of statements found to be "in furtherance of" a conspiracy include, "statements identifying other conspirators and their roles in the conspiracy, statements to inform other conspirators of the activities or status of the conspiracy, and statements as to the source or purchaser of controlled substances." *United States v. Hitow*, 889 F.2d 1573, 1581 (6th Cir. 1989) (internal citations omitted). The statement by Adan, the supplier, to Yebra, a coconspirator tasked with transporting the cocaine, about the person they should expect to meet at the other end—whether true or not—was one intended to promote conspiratorial objectives. Whether intended to allay fears or communicate a minimum amount of information to the

coconspirators, the cryptic statement was intended to further the conspiracy, and admission of the statement did not result in plain error.

### 4. Prosecutorial Misconduct

Finally, claiming prosecutorial misconduct, defendant points to several comments made in opening statement and closing argument. In reviewing claims of prosecutorial misconduct, we determine first whether the statements were improper and, if so, whether the impropriety was so flagrant as to warrant reversal. *See United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008). The court weighs four factors in determining flagrancy: (1) whether the conduct and remarks tended to mislead the jury or prejudice the defendant; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong. *Id.*; *see also United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). Since no objections were lodged, our review is for plain error.

First, defendant claims that the prosecutor misstated the facts in opening by saying: "Mr. Zertuche's role in that conspiracy was he knew the delivery point. He lived and worked in North Carolina and had a guy there ready to buy." This was not improper, as it was indeed the government's theory. There was circumstantial evidence offered that supported the inference that defendant knew the undisclosed destination for the cocaine and that his role was to see that it got delivered. Defendant has not shown error in this regard.

Second, defendant contends that the prosecutor misstated the evidence in closing argument by implying (through the use of ambiguous pronouns) that defendant was in or near the house when the cocaine was loaded. The statement was: "You have got his brother-in-law, Juan Adan. He doesn't meet him at the house. He meets him down the road, not at the house where

the narcotics are being distributed, but down the road." Even accepting defendant's claim that the first reference to "he" must refer to defendant, no fair reading of the comment misstates the evidence by placing the defendant where the cocaine was being loaded. There was no impropriety.

Finally, it is argued that it was improper for the prosecutor to have implied in closing argument that the intended recipient of the cocaine might have been "Oscar, the Cuban." To the extent defendant incorporates the hearsay objection to Yebra's testimony, we have found no plain error as it was admissible as a coconspirator statement under Rule 801(d)(2)(E). What remains, it seems, is the claim that no witness testified that Oscar was Cuban. It is important to consider this comment in the context of the trial as a whole, with attention to whether the comment may have been invited by defense counsel's conduct. *See United States v. Barnett*, 398 F.3d 516, 522-23 (6th Cir. 2005).

Here, the record reflects that defense counsel injected the idea that Oscar was Cuban into the trial by asking defendant's brother about "a Cuban engineer by the name of Oscar." Moreover, defendant's brother and wife both implicitly agreed that Oscar was Cuban when it was suggested by the questioning. No clarification was elicited, no objection was made, and no suggestion has been made that the jury was actually misled on that score. The prosecutor's comment in closing that it may not have been a coincidence that defendant had worked for a Cuban named Oscar was not flagrantly improper so as to constitute plain error. *See United States v. Young*, 470 U.S. 1, 16 (1985).[5]

---

[5]Without commenting whether Oscar was or was not Cuban, Marcos Zertuche answered that he had seen Oscar only twice, did not know if Oscar was an engineer or some other professional, and confirmed that defendant had worked for and rented from Oscar. Defense counsel asked Santos about the defendant's friend, who was a "very wealthy man named Oscar." On cross-examination, the prosecutor asked Santos

**AFFIRMED**.

---

whether defendant had said he needed to get back to work for "Oscar, the Cuban guy," and she answered that she actually did not know why he said he needed to get back for work.