**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name:  14a0676n.06

No. 12-6619

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Aug 28, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| ARCHIE M. WHALEN, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:  GIBBONS, SUTTON, and WHITE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.**  A federal jury convicted Archie Whalen of violating 18 U.S.C. § 2423(a), which makes it illegal to transport a minor in interstate commerce with the intent to engage in sexual activity.  The district court sentenced Whalen to 360 months of incarceration.  In this direct appeal Whalen challenges some of the various evidentiary and procedural rulings that the district court made at trial as well as the procedural reasonableness of the sentence that the court imposed.  Whalen also asks this court to hold that his trial counsel was constitutionally ineffective.  We affirm.

**I.**

The disturbing events that led to this prosecution can be traced back to January 2009, when Tammy Gail Ward and Jonathan Mitchell began to communicate online.  They became interested in getting to know one another, and Mitchell, who lived in Massachusetts, visited Ward and her four children at Ward's house in Kentucky.  Mitchell returned to Massachusetts

one week later, and the relationship continued to progress. Intent on "making a new life with each other," said Ward, she and Mitchell agreed to move to Maine, where Mitchell planned to organize a joint trucking venture with his friend, Archie Whalen. Whalen owned a house in Maine and invited Mitchell, Ward, and her four children to stay with him. In early September 2009 Mitchell and Whalen traveled together to Kentucky, where they collected Ward and her children before setting out for Maine.

Soon after their arrival in Maine, Whalen, who was forty-three years old, began to spend an inordinate amount of time with Ward's oldest child, Haley, who was thirteen years old. Whalen often took Haley shopping and invited her to join him on trips to visit family members, yet he never invited Ward's other children. Mitchell confronted Whalen several times about his relationship with Haley, and both Mitchell and Ward discussed it with Haley. Whalen and Haley each denied that anything inappropriate was taking place. But that turned out to be false. Soon after her arrival in Maine, Haley began to sneak across the hall to Whalen's bedroom. She testified that she would just lie there, and Whalen would kiss her. At times, however, far more inappropriate conduct took place. On one occasion Haley and Whalen engaged in sexual intercourse in Whalen's bedroom, prompting Mitchell to come upstairs to inquire about the noise. On another occasion, during a shopping expedition, Whalen performed oral sex on Haley.

Mitchell and Ward continued to be suspicious of Whalen's interactions with Haley. A conversation between Mitchell and Whalen about two weeks after Ward's arrival boiled over into an altercation, at which point Whalen made clear that Mitchell was no longer welcome to stay at Whalen's house. Mitchell left the house on foot that night. Mitchell and Ward both called the sheriff's office later that night to ask a sheriff's deputy to escort Ward and her children from Whalen's property. When the sheriff's deputies arrived, Haley refused to leave. Whalen

invited both Ward and Haley to stay with him indefinitely, and he separately invited Ward to leave Haley with him if Ward elected to go. Ward rejected both ideas out of hand. Haley refused to heed her mother's decision, however, and the "sheriff had to physically pick her up and put her in the vehicle because she was screaming and crying that she did not want to leave."

Ward and the four children went to a motel, where Ward's ex-husband met them to take them back to Kentucky. But Whalen and Haley continued to communicate regularly with one another using an instant-messaging service on their phones and computers. Whalen often expressed his love for Haley, his disappointment in their separation, his desire to marry her, and his intent to come to Kentucky to pick her up. Haley responded with a description of the house where she was staying in Kentucky and encouraged Whalen to come get her. Because Haley shared her cell phone with Ward, Whalen told Haley to delete all of the messages that Haley sent and received "[b]ecause if someone found out, he'd be in trouble."

A few days later, on September 26, 2009, Ward awoke to discover that Haley was missing. Ward checked their shared cell phone and saw a text message, apparently written by Haley to Whalen, stating, "Where are you at now?" Suspicious that Whalen had taken Haley, Ward called the local sheriff and reported Haley's absence. The sheriff issued an AMBER alert notifying authorities nationwide of the missing child, and the FBI pursued various leads to determine where Whalen was headed.

Whalen had intended to take Haley to his sister's house in Wisconsin. During the drive to Wisconsin, Whalen instructed Haley to throw his cell phone from the car to avoid being tracked by the police. They stopped overnight in Indiana, and as they lay in the back of Whalen's truck, he inserted his finger into Haley's vagina. They continued to Wisconsin in the morning, but they were unable to find Whalen's sister's house. As they were stopped in a hotel parking lot, a local

police officer recognized Whalen's truck from a BOLO ("be on the lookout") issued by the FBI. Inside the truck the officer found Whalen and Haley.

Haley told the authorities in Wisconsin that Whalen had neither harmed nor inappropriately touched her, but the local police nevertheless took Haley to a hospital to be examined. Two women—a social worker named Beth Moeller and a police officer named Wendy—then interviewed Haley in Wisconsin. After initially denying any inappropriate contact by Whalen, Haley eventually told the interviewers that Whalen had engaged in sexual intercourse with her in Maine and had digitally penetrated her during their drive to Wisconsin.

In October 2009 a grand jury returned a one-count indictment charging Whalen with transporting a minor in interstate commerce with the intent to engage in sexual activity, in violation of 18 U.S.C. § 2423(a). After a three-day trial in July 2012, the jury adjudged Whalen guilty of the lone count. In December 2012 the district court sentenced Whalen to 360 months of incarceration and ten years of supervised release. Whalen timely appealed.

## II.

Whalen asserts various arguments related to the district court's evidentiary and procedural rulings at trial, the effectiveness of Whalen's trial counsel, and the procedural reasonableness of Whalen's sentence. We take the arguments in turn.

## A.

Whalen first argues that the district court infringed his Sixth Amendment right to a public trial by closing the courtroom during Haley's testimony without first "conducting an independent inquiry regarding the statutory criteria for closing the courtroom" under 18 U.S.C. § 3509(e). This argument has been waived, however, because Whalen's trial counsel twice stated that he had no objection to the courtroom closure as long as Haley testified from the witness stand rather

than via closed-circuit television. *See Peretz v. United States*, 501 U.S. 923, 936 (1991) (citing *Levine v. United States*, 362 U.S. 610, 619 (1960)); *United States v. Christi*, 682 F.3d 138, 142–43 & n.1 (1st Cir. 2012); *United States v. Hitt*, 473 F.3d 146, 155 & n.8 (5th Cir. 2006). Whalen thus is precluded from directly challenging the courtroom closure.

Whalen makes two rebuttal arguments. He first relies on *United States v. Canady*, 126 F.3d 352, 359 (2d Cir. 1997), to establish that the failure to object to a Sixth Amendment public-trial violation does not constitute a knowing and intelligent waiver of that right. Whatever the merits of that general rule, two features of *Canady* set that case apart from Whalen's. First, *Canady* involved a defense counsel's failure to object rather than the intentional relinquishment of the public-trial right. Whalen's attorney twice confirmed that he had no objection to the courtroom closure, which constituted an intentional relinquishment of the right. Second, the trial court in *Canady* never notified the defense of the court's intent to mail its verdict to the defendant rather than announcing the verdict in open court. *Id.* Whalen's attorney, in contrast, was told point-blank that the courtroom would be closed during Haley's testimony, and Whalen therefore cannot establish that the waiver was unknowing or accidental.

Whalen also disputes whether his trial counsel could waive his Sixth Amendment public-trial right on his behalf. It is true that "certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate." *Florida v. Nixon*, 543 U.S. 175, 187 (2004). But Whalen cites nothing to show that the Sixth Amendment public-trial right is one of those rights. The district court closed the courtroom only during Haley's testimony, and we know of no precedent supporting a conclusion that Whalen's trial counsel was not entitled to give consent to that limited closure on Whalen's behalf. Whalen therefore is bound by his trial attorney's waiver.

**B.**

Whalen next contends that the government improperly introduced the lay opinion testimony of Beth Moeller, the child protection worker who interviewed Haley in Wisconsin shortly after local police officers spotted Whalen's car in a hotel parking lot. On direct examination Moeller testified that it is not unusual for juvenile victims of sex crimes to deny the sexual contact. When pressed for an explanation, Moeller stated:

> Well, it can be for a variety of reasons. I think in this instance, Haley and I had no prior relationship. She was learning if she could trust me. She was embarrassed and shy was the sense I had from her, and I got the sense that she really cared about Archie and he really cared about her and didn't want him to get in any trouble and that she knew what she could disclose could cause some trouble for him.

A couple minutes later Moeller recounted that Haley became tearful and tired toward the end of the interview, which Moeller described as a "kind of a 'there, I've said it' tired."

The government never qualified Moeller as an expert, and her testimony, to the extent it expressed her personal opinions, was lay-opinion testimony. Federal Rule of Evidence 701 forbids the use of lay-opinion testimony unless it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." The admission of Moeller's lay opinion is reviewed for plain error because Whalen did not contemporaneously object. *See United States v. Trejo*, 471 F. App'x 442, 452 (6th Cir. 2012). To establish plain error Whalen "must show (1) there was error (2) that was obvious or clear, (3) that affected the defendant's substantial rights, and (4) that, in our discretionary review, affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Zertuche*, No. 13-5746, 2014 WL 1674104, at *5 (6th Cir. Apr. 29, 2014) (citing *United States v. Oliver*, 397 F.3d 369, 378–79 (6th Cir. 2005)).

We need not decide whether Moeller's testimony improperly veered into forbidden lay opinion because any error was not plain. "'[L]ay opinion testimony is permitted under Rule 701 because it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event.'" *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013) (quoting *United States v. Jayyousi*, 657 F.3d 1085, 1120 (11th Cir. 2011) (Barkett, J., concurring in part and dissenting in part)). Moeller framed her testimony as a personal opinion based on Haley's demeanor—"the sense [Moeller] had from [Haley]" based on her observations throughout their conversation. Although Moeller's personal opinion no doubt drew on her experience and specialized knowledge as a child protection worker, she attempted to fit her testimony within the contours of Rule 701 by purporting to base her opinion solely on her perception of Haley over the course of the interview. Insofar as Moeller's testimony drew on her expertise as a social worker, moreover, the prosecution might have been able to qualify Moeller as an expert had Whalen contemporaneously objected. Thus the admission of Moeller's opinion testimony was not plain error.

Whalen also contends that Moeller improperly vouched for Haley's credibility. He relies on *United States v. Hill*, 749 F.3d 1250, 1263 (10th Cir. 2014), where the court vacated a defendant's conviction on plain-error review because a federal law-enforcement agent had improperly provided expert testimony impugning the veracity of the defendant's testimony. But the *Hill* court was swayed by the fact that the agent's testimony about the defendant's credibility "was not an isolated aside." *Id.* The agent, whose expert testimony was offered for the express purpose of establishing the defendant's mendacity, "testified flatly and repeatedly that, in his expert opinion, [the defendant] was dishonest during his interview." *Id.* At Whalen's trial, by

contrast, the general purpose of Moeller's testimony was not to buttress Haley's credibility, and Moeller's isolated comment touched on Haley's credibility only indirectly. The district court's failure to strike Moeller's testimony *sua sponte* was not plain error.

**C.**

Whalen also argues that the district court infringed his Sixth Amendment right "to be confronted with the witnesses against him" when the court prohibited Whalen's trial counsel from playing the full audio recording of Moeller's two-and-a-half-hour conversation with Haley. The government retorts that Whalen waived his right to raise this challenge because Whalen's trial counsel acquiesced when the court refused to permit him to play the entire recording. *See Scott v. Miller*, 361 F. App'x 650, 654 (6th Cir. 2010) (stating that a defendant waives the right to challenge a trial error if the defendant intentionally relinquishes or abandons the challenge (citing *Puckett v. United States*, 556 U.S. 129, 135 (2009))).

Whalen's trial counsel never affirmatively renounced his right to challenge the district court's decision. After the court suggested that Whalen's counsel use the interview transcript rather than the full audio recording, counsel stated, "If that's the way the court wants me to do it, I am prepared to do it that way." The court then advised counsel to "use that transcript," to which counsel responded, "Okay." At most that amounts to acquiescence rather than intentional relinquishment, and acquiescence to a court order does not constitute waiver. *Cf. United States v. Cleaves*, 299 F.3d 564, 567 & n.2 (6th Cir. 2002).

Whalen nevertheless failed to preserve the claim. The district court's ruling was evidentiary in nature, so our review is governed by Federal Rule of Evidence 103 rather than Federal Rule of Criminal Procedure 51(b). Whalen's citation to *United States v. Lynn*, 592 F.3d 572, 577–78 (4th Cir. 2010), which analyzed the preservation of errors under Rule 51(b), is

therefore misdirected. Rule 103 requires parties to "timely object[]" to preserve error. The acquiescence of Whalen's attorney was a far cry from a formal objection, and accordingly we review this claim for plain error. *See United States v. Nixon*, 694 F.3d 623, 628 (6th Cir. 2012) ("Because the district court made no definitive ruling about Rufus's testimony—e.g., 'sustained' or 'overruled'—but instead suggested a procedure for the prosecutor to follow to elicit opinion testimony from Rufus, Nixon's counsel had an obligation to reiterate the objection in order to preserve it for appeal.").

Whalen maintains that he needed to introduce the recording in order to impress on the jury "the tone and demeanor of Haley's denial of sexual activity in response to the questioning" as well as the extent to which Moeller admonished Haley to tell the truth. A central feature of his defense, he claims, was the fact that Haley "insisted on at least 15 occasions that Whalen had not touched her," even after Moeller repeatedly and earnestly cautioned Haley about the importance of telling the truth. Whalen thus wanted to use the tapes to show that Haley, in response to Moeller's instructions, had made prior statements that were consistent with Whalen's defense and inconsistent with the substance of Haley's testimony at trial. Yet Haley admitted on direct examination that she had denied any sexual contact when Moeller first questioned her, and Whalen therefore cannot establish any inconsistency between Haley's trial testimony and the content of the audio recordings.

Haley's prior statement was not given under penalty of perjury and therefore was not admissible under Federal Rule of Evidence 801(d)(1)(A). The question is whether it was admissible under Rule 613(b), which permits a party to introduce extrinsic evidence of a witness's prior inconsistent statement "only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it,

or if justice so requires." The circuits are split on whether a criminal defendant is entitled to introduce extrinsic evidence of a prior false or inconsistent statement when the witness admits at trial that she made the statement and that it was false. *Compare United States v. Lashmett*, 965 F.2d 179, 182 (7th Cir. 1992), *and Williams v. United States*, 403 F.2d 176, 179 (D.C. Cir. 1968), *with United States v. Soundingsides*, 820 F.2d 1232, 1240–41 (10th Cir. 1987), *and United States v. Cline*, 570 F.2d 731, 735 (8th Cir. 1978).

This court has never taken sides in that debate. In *United States v. Davis*, 28 F.3d 1214, at *3 (6th Cir. 1994) (unpublished table disposition), a government witness admitted on direct examination that he had signed an affidavit, prepared by the defendant and later contradicted at trial, in which the witness denied being present when the defendant confessed to the crime with which he was charged. The court held that the district court's refusal to admit the affidavit under Rule 613 "was harmless, if error, as the substance of the inconsistent statement was before the jury and admission of the affidavit itself would have been cumulative." *Id.*

Again we need not determine whether extrinsic evidence of a prior inconsistent statement is generally admissible when the witness concedes that she made the inconsistent statement. This is plain-error review, and the district court's refusal to permit Whalen to play the entire recording was not plain error. For one thing, it is difficult to say that an error is "clear" or "obvious" when the legal issue underlying the error has divided the circuits. *See United States v. Lanham*, 617 F.3d 873, 884 (6th Cir. 2010); *United States v. Williams*, 53 F.3d 769, 772 (6th Cir. 1995) ("[E]ven if we found the district court's determination to be error, the circuit split precludes a finding of plain error."). For another, Whalen cannot establish that the court's exclusion of the entire recording affected his substantial rights. Both the government and the court permitted Whalen to use isolated segments of the recording, but Whalen's attorney said he

lacked the technological resources to break the recording into segments. Whalen's attorney never sought assistance with that technological endeavor. After the court advised Whalen's attorney to use the transcript provided by the government, counsel asked for a few minutes to prepare his cross-examination, and the court granted the request. Even if the transcript was an imperfect substitute for the audio recording, the district court's solution to the technological conundrum did not violate Whalen's substantial rights. And we cannot determine the adequacy of the transcript as a substitute because neither the transcript nor the recording is in the record.

Whalen tries to show plain error by comparing his case to *United States v. Ebens*, 800 F.2d 1422, 1430–31 (6th Cir. 1986), where this court held that the district court committed reversible error when it refused to permit the defendant to introduce into evidence the "entire contents" of various tapes that recorded conversations between the government's three principal witnesses and a local activist who had coached those witnesses to give false testimony. But the two cases are far from analogous. The district court in *Ebens* excluded the recordings on the basis of hearsay, but on appeal the government conceded the district court's error because the tapes were not being offered to prove the truth of the matter asserted; rather, the defense wanted to introduce the tapes to show the effect of the activist's coaching on the government witnesses. *Id.* at 1430. Because the only litigated issue in *Ebens* was whether an assault was racially motivated, we held that the improper exclusion of the tapes was not harmless because the tapes established that the racial aspect of the assault was fabricated after the fact by the local activist. *Id.* at 1431. Whalen, in contrast, wanted to use the tapes in part to introduce Haley's previous denial of sexual contact, which is hearsay. Whalen never asserted in the district court that the jury needed to view the tape, in part or in its entirety, to appreciate that Moeller influenced Haley's testimony. *Ebens* therefore is inapposite.

**D.**

Whalen next argues that he should have been permitted to use the interview transcript to question Haley about her prior statements accusing Jon Mitchell, her mother's ex-boyfriend, of inappropriately touching her. On direct examination the prosecutor asked Haley whether she remembered "say[ing] some things about Jon grabbing your butt and making inappropriate comments or suggestive comments to you." After Haley affirmed that she had made the statement but denied its veracity, the prosecutor asked why she said it, to which Haley replied, "Archie [Whalen] told me to say that." Whalen's attorney returned to this subject on cross-examination, when he held the interview transcript and asked Haley whether she "remember[ed] telling Beth Moeller that your mom witnessed" Mitchell "grab[] your rear end." But the prosecutor objected: "I thought we were going to be using the transcript to impeach prior inconsistent statements. What is happening here is that Mr. Wilkey is just reading additional portions of the transcript around that issue, but there's no inconsistency here." Whalen now argues that he was entitled to question Haley about her prior statements using the transcript of the conversation with Moeller.

The government again argues that Whalen waived this challenge when his trial counsel agreed to "move on" in response to the government's objection. And once again that argument fails. Whalen's attorney said, "If I need to move on, I'll move on from that and take up the next issue." Whalen's attorney thus agreed to "move on" only if instructed to do so by the court, and his compliance with the court's instructions does not amount to the intentional abandonment of that line of questioning. Neither compliance nor acquiescence is abandonment.

Yet Whalen cannot obtain the relief he seeks. This claim too is reviewed for plain error because Whalen did not object. *See Nixon*, 694 F.3d at 628. Here the district court departed

from its earlier proposal to permit Whalen to use the transcript to impeach Haley. But its change of heart was not plain error. As noted above, the circuits are split on whether extrinsic evidence of a prior inconsistent statement is admissible when the witness has already testified to the substance of the inconsistency and proclaimed the statement's mendacity on direct examination. We also cannot determine whether the district court's evidentiary ruling prejudiced Whalen because the transcript is not in the record. Thus we cannot say that the exclusion of the transcript was plain error.

**E.**

Whalen's next challenge arises under Federal Rule of Evidence 901(a), which facilitates the authentication of evidence by requiring the proponent of the evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." The government questioned Ward, Haley's mother, about certain Yahoo! instant messages that Ward discovered on Haley's cell phone, and Ward testified that she believed Whalen to be the source of the messages. Whalen contends that the admission of screenshots of the instant messages was error because "the government needed to produce the testimony of the custodian of the Yahoo accounts registry or other qualified witness . . . regarding the ownership of the instant messaging account under the user name 'WHA_1.'"

Whalen did not object to the admission of the screenshots, and once again his argument is reviewed for plain error. *See United States v. Munnerlyn*, 202 F. App'x 91, 96 (6th Cir. 2006). That standard he cannot satisfy. The district court had no obligation *sua sponte* to require the government to establish a stronger link between Whalen and the instant messages. That is the defense lawyer's job, not the court's. Whalen has provided no evidence showing that someone else sent the messages, *see United States v. Rudinsky*, 439 F.2d 1074, 1076 (6th Cir. 1971), and

there was sufficient testimony presented at trial for the jury to conclude that Whalen sent the messages. That is all Rule 901(a) requires.

Whalen also accuses the prosecutors of failing to disclose the screenshots in pretrial discovery. The government disputes that allegation, but Whalen notes that he raised this same objection at sentencing. Nonetheless, even if the government failed to disclose the screenshots before trial, Whalen has not explained how the omission injured him. He does not suggest that the screenshots were doctored or otherwise inaccurate, nor does he explain what he would have done differently had he known about the prosecutor's intent to use the screenshots. Whalen therefore fails to establish plain error affecting his substantial rights.

**F.**

Whalen asks this court to reverse his conviction due to the ineffective assistance of his trial counsel. "The usual rule is that a defendant may not raise claims for ineffective assistance of counsel on direct appeal." *United States v. Sullivan*, 431 F.3d 976, 986 (6th Cir. 2005). Ineffective-assistance claims instead should be raised in post-conviction proceedings under 28 U.S.C. § 2255, which affords both parties an opportunity to develop an adequate record and provides the district court with the first chance to address the claim and to resolve the factual disputes that inhere in ineffective-assistance claims. *See id.*; *United States v. Brown*, 332 F.3d 363, 368–69 (6th Cir. 2003). Occasionally this court will depart from the usual rule and will address the merits of an ineffective-assistance claim on direct appeal, "but only when the record is adequate to address the claim." *Sullivan*, 431 F.3d at 986.

We see no reason to address Whalen's ineffective-assistance claims on direct appeal. There are too many undeveloped aspects of the record relevant to such a claim, and Whalen

would be better served presenting these claims to the district court after further developing the factual basis for his claims.

**G.**

In his final claim Whalen argues that the district court improperly calculated the Guidelines sentencing range. This court reviews the procedural reasonableness of a defendant's sentence for abuse of discretion. *United States v. Novales*, 589 F.3d 310, 314 (6th Cir. 2009). The sentence imposed by a district court is procedurally unreasonable if the court incorrectly calculated the applicable Guidelines sentencing range. *Id.*

Whalen challenges the district court's calculation of the Guidelines sentencing range on two grounds. He first contends that the district court improperly enhanced Whalen's offense level under U.S.S.G. § 2G1.3(b)(3), which instructs the court to add two levels if the offense involved the use of a computer to "persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct." Whalen argues that application of the enhancement was inappropriate because he "did not use a computer to target, meet, or develop a relationship with" Haley.

By its plain terms, however, the enhancement instructs courts to add two levels if the defendant used a computer to persuade a minor to engage in prohibited sexual conduct. Without question that standard has been met. The evidence at trial showed that Whalen repeatedly used an instant-messaging service on his home computer to encourage Haley to desert her mother and siblings and to elope with Whalen. During those conversations Whalen repeatedly told Haley that he would come to Kentucky to pick her up, that he "hope[d] you don't want another guy," that he loved her, and that he would do anything to be with her. Surely the court could conclude from these messages, together with the fact that Whalen engaged in prohibited sexual conduct

once he rendezvoused with Haley, that Whalen used his computer to persuade Haley to engage in prohibited sexual conduct. *See United States v. Lay*, 583 F.3d 436, 447 (6th Cir. 2009) ("Although Lay did not explicitly propose sexual relations in a computer message, Lay communicated with M.V. for one to two months with the apparent intention of having prohibited sexual relations with M.V. Enticement does not require crude specification of intent.").

Whalen also contends that the application of two different sentencing enhancements— U.S.S.G. §§ 2G1.3(b)(4) and 4B1.5(b)(1)—resulted in impermissible double-counting. Section 2G1.3(b)(4) instructs the district court to apply a two-level enhancement if the offense involved the commission of a sex act. Section 4B1.5(b)(1) imposes a five-level enhancement if the defendant committed a covered sex crime and also engaged in a pattern of activity involving sexual conduct. Whalen maintains that the same conduct underlying the application of § 2G1.3(b)(4) was one of the predicate acts used to show a pattern of sexual activity under § 4B1.5(b)(1). Whalen must clear the plain-error hurdle because he did not object at sentencing.

The district court did not engage in improper double counting. "'Double counting occurs when precisely the same aspect of the defendant's conduct factors into his sentence in two separate ways,' but not where the defendant is punished for distinct aspects of his conduct." *United States v. Morgan*, 687 F.3d 688, 695 (6th Cir. 2012) (quoting *United States v. Battaglia*, 624 F.3d 348, 351 (6th Cir. 2010)). We need not decide whether the same conduct can be used to apply separate enhancements under §§ 2G1.3(b)(4) and 4B1.5(b)(1) because nothing in the presentence report or sentencing transcript suggests that the district court relied on the same conduct to impose each enhancement. Whalen engaged in prohibited sexual conduct with Haley on three occasions: twice in Maine and another time in Indiana. One of those incidents could have been used to impose the § 2G1.3(b)(4) enhancement, and the other incidents, together with

the prior history of illicit sexual activity depicted in Whalen's presentence report, could have been used to enhance his sentence under § 4B1.5(b)(1). Thus the district court's application of both enhancements was not plain error.

## III.

Whalen's conviction and sentence are affirmed.